# **EXHIBIT 1**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-3311

AMERICAN TOWERS LLC,
SPECTRASITE COMMUNICATIONS, LLC,
and INSITE WIRELESS GROUP, LLC,

      Plaintiffs,

v.

DISH WIRELESS L.L.C.,

      Defendant.

---

## COMPLAINT FOR DECLARATORY JUDGMENT

---

American Towers LLC, SpectraSite Communications, LLC, and InSite Wireless Group, LLC (collectively, "American Tower," or the "Company"), by and through their undersigned counsel, file this Complaint For Declaratory Judgment against DISH Wireless L.L.C. ("DISH") and allege as follows:

### SUMMARY OF ACTION

1.     This action arises out of DISH's contrived efforts to evade its clear and undisputed contractual obligations to American Tower, including its obligation to make ███████ payments for the use of cell tower facilities that it leases from American Tower to operate its Boost Mobile wireless communications business.

2.     DISH and other wireless carriers rely on exclusive licenses from the Federal Communications Commission ("FCC")—called spectrum licenses—for the right to use radio frequencies, which transmit data to allow DISH to provide wireless services to its customers.

DISH transmits those signals to its customers from the space that it leases on cell towers owned by American Tower and other tower companies. In addition to providing the tower infrastructure that carriers such as DISH need to operate their wireless businesses, American Tower performs a range of services for its carrier tenants, including maintenance, tower upkeep, site development and engineering, and property management.

3.     In August and September 2025, DISH's parent, EchoStar Corporation ("EchoStar"), entered into two highly lucrative and profitable transactions to sell certain spectrum licenses used to support DISH's Boost Mobile network to AT&T Inc. ("AT&T") and Space Exploration Technologies Corporation ("SpaceX") for approximately $40 billion (the "Transactions").[1]

4.     EchoStar's business decision to enter into the Transactions and sell those licenses— a clear pivot in its business plans for Boost Mobile to use that spectrum—has resulted in DISH claiming that its need for the space that it leases on American Tower's towers is now reduced. In reality, DISH is simply seeking to use the cover of the Transactions and its supposed reduced need for tower space as a basis to escape its clear and undisputed contractual obligations to American Tower.

5.     Shortly after the Transactions were announced, on September 24, 2025, DISH delivered a notice to American Tower (the "September 24 Notice") purporting to be excused from its contractual obligations to American Tower, claiming that the FCC had forced EchoStar to sell its spectrum licenses to resolve an FCC inquiry, commenced in May 2025, into the underutilization of those licenses. DISH claimed that the FCC inquiry and the highly lucrative Transactions that

---

[1] Although the Transactions are subject to certain closing conditions, including regulatory approval, EchoStar nevertheless has stated that it expects the Transactions to close in 2026.

followed were "unforeseeable events" that somehow "frustrated the purpose" and "destroyed the value" of its agreement to lease tower space from American Tower.

6.      There is no factual, contractual, or legal basis for this charade.

7.      As an initial matter, the events that DISH claims frustrated the purpose of its agreement with American Tower were entirely foreseeable; ████████████████████████ ████████████████████████████████████████ Strategic Collocation Agreement ("SCA") that the parties entered into in March 2021.

8.      The SCA is a highly valuable and important long-term contract between DISH and American Tower.  It enables DISH to access American Tower's nationwide tower infrastructure to build out its Boost Mobile 5G Network by granting DISH the right to lease space at American Tower's cell tower facilities ("Tower Facilities").  In return, DISH promised to make ███████████ ████████████████████ payments to American Tower ███████████████

9.      Over the years, American Tower has been a generous and accommodating partner to DISH in its network buildout.  To help facilitate DISH's buildout, and based on DISH's stated position that it would become a meaningful fourth carrier (alongside the "Big Three" of AT&T, Verizon, and T-Mobile), ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████

10.      There was no guarantee at the time that DISH entered into the SCA that its Boost Mobile 5G Network buildout plans would be achieved on its expected timeline, or at all.  DISH

nevertheless committed to making the ████ payments to American Tower ███████████

████████████████████████████████████████████████████████████████████████

███████████████

11. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

12. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████

13. ████████████████████████████████████████████████

████████████████████████████████████████████████████████ And
that is particularly so where, as here, all of the events on which DISH purports to rely as a basis
for non-performance—including its delayed buildout that precipitated the FCC inquiry—were
squarely within the control of DISH and its affiliates.

14. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ None of

those circumstances, entirely foreseeable to the parties upon executing the SCA, provide a basis

to excuse DISH from its contractual obligations, whether under the rarely invoked or accepted

"frustration of purpose" doctrine or any other Hail Mary theory that DISH may seek to advance.

15.     Moreover, the claimed predicate for DISH's contrived legal theory is without

factual basis: EchoStar was not "forced" to sell its spectrum licenses by the FCC or anyone else.

Following the closing of the highly profitable Transactions (valued at $40 billion) and the

repayment of EchoStar's debt, EchoStar expects to retain over $24 billion in cash, leaving it—in

the words of its Chairman Charlie Ergen—"cash-rich."  Indeed, AT&T has acknowledged that it

is "well aware" that it is paying "more than what [DISH] paid for spectrum at auction."  Mr. Ergen

has also made clear to the public and investors that EchoStar would have "w[o]n the battle" with

the FCC in any litigation relating to its spectrum licenses.

16.     Further, DISH's claim that the FCC inquiry and subsequent Transactions leave it

unable to perform its obligations under the SCA is also contradicted by the facts and its own

statements.  EchoStar's CEO and President, Hamid Akhavan, told the public and investors that the

Transactions have "kept [EchoStar] in a marketplace in a very aggressive way without any

limitations to grow and compete," and that EchoStar continues to hold spectrum licenses and still

has a "great subscriber base in the marketplace."  To that end, nothing about the Transactions has

prevented DISH from continuing to pay for and operate at the Tower Facilities.  Indeed, DISH

expressly stated in the September 24 Notice that it did not wish to shut down operations at all

Tower Facilities due to its ongoing operations—in effect, DISH wants to keep the SCA or some form of collocation agreement in place as to certain Tower Facilities, but not others. ████████ ████████████████████████████████████

17. Recognizing that its efforts to claim that performance is excused are contrived and without basis in fact or law, DISH appears to be positioning itself to evade any future liabilities or judgment against it. ██████████████████████████████████████ ███████████████████████████████ in its September 24 Notice, DISH went out of its way to state that it "is not entitled to receive any of the spectrum sale proceeds at closing." But again, whether or not DISH receives those sale proceeds, nothing about the Transactions prevents DISH from continuing to make payments as required under the SCA. And DISH's suggestion that it will not have sufficient revenue to make such payments is contradicted by DISH's own public statements following the Transactions, including that DISH will be able to make Boost Mobile "way more competitive" after the Transactions by operating it as a hybrid Mobile Virtual Network Operator ("MVNO"), whereby Boost Mobile will offer cell coverage to its customers through network infrastructure leased from other wireless carriers.

18. In all events, to the extent that DISH and EchoStar conspire to prevent DISH from paying American Tower the ███████ fees that have yet to come due under the SCA, whether through the transfer or sale of spectrum licenses to EchoStar, or any concerted decision by EchoStar to strip DISH of assets and leave it judgment-proof, American Tower will hold DISH, EchoStar, and all of their affiliated entities accountable for all damages that it incurs.

19. Accordingly, through this action, American Tower seeks a declaratory judgment that DISH has not been excused from performing its obligations under the SCA, that the SCA

remains in full force and effect, and that DISH remains obligated to perform all of its obligations under the SCA.

## PARTIES, JURISDICTION, AND VENUE

20.    Plaintiff American Towers LLC is a Delaware limited liability company with American Tower Corporation as its sole member.  American Tower Corporation is a Delaware corporation that maintains its principal place of business in Boston, Massachusetts.  As such, American Towers LLC is a citizen of Delaware and Massachusetts.

21.    Plaintiff SpectraSite Communications, LLC ("SpectraSite Communications") is a Delaware limited liability company with SpectraSite, LLC as its sole member.  SpectraSite, LLC is a Delaware limited liability company with American Tower Corporation as its sole member.  As noted above, American Tower Corporation is a Delaware corporation that maintains its principal place of business in Boston, Massachusetts.  As such, SpectraSite Communications is a citizen of Delaware and Massachusetts.

22.    Plaintiff InSite Wireless Group, LLC ("InSite Wireless Group") is a Delaware limited liability company with IWG Holdings, LLC as its sole member.  IWG Holdings, LLC is a Delaware limited liability company; its two members are MIP III Iron Holdings LLC and American Tower Investments LLC.  MIP III Iron Holdings LLC is a Delaware limited liability company with ATC MIP III REIT Iron Holdings LLC as its sole member.  ATC MIP III REIT Iron Holdings LLC is a Delaware limited liability company with American Tower Investments LLC as its sole member.  American Tower Investments LLC is a California limited liability company; its two members are ATC TRS II LLC and American Towers LLC.  ATC TRS II LLC is a Delaware limited liability company with American Towers LLC as its sole member.  American

Towers LLC is a Delaware limited liability company with American Tower Corporation as its sole member. As noted above, American Tower Corporation is a citizen of Delaware and Massachusetts. As such, InSite Wireless Group is a citizen of Delaware and Massachusetts.

23. Defendant DISH is a Colorado limited liability company that maintains its principal place of business in Englewood, Colorado. DISH DBS Corporation is DISH's sole member. DISH DBS Corporation is a Colorado corporation and maintains its principal place of business in Englewood, Colorado. As such, DISH is a citizen of Colorado.

24. EchoStar, which is not a named defendant, is a Nevada corporation that is headquartered in Englewood, Colorado. EchoStar is the ultimate parent of Defendant DISH.

25. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

26. American Tower brings this action for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

27. This Court has both general and specific personal jurisdiction over DISH. The exercise of general jurisdiction is proper because DISH is headquartered in this District and maintains its principal place of business here, rendering it at home in this forum. The exercise of specific jurisdiction is also proper because the claims in this action arise out of and relate to DISH's conduct and activities within this District. The exercise of jurisdiction by this Court over DISH in this action is reasonable, and DISH has sufficient minimum contacts with this District such that the maintenance of this action here does not offend traditional notions of fair play and substantial justice.

28.     As described below, an actual and substantial controversy exists between the parties regarding their rights and obligations under the SCA and whether DISH remains obligated to perform its obligations under the SCA.

29.     Venue is proper in this Court pursuant 28 U.S.C. § 1391(b)(1) because DISH resides in this District.

## FACTUAL ALLEGATIONS

### I.     DISH ANNOUNCED AMBITIOUS 5G COMMITMENTS IN 2019.

30.     DISH is the mobile and 5G network arm of EchoStar.  Its primary function is to serve as a nationwide wireless carrier through its Boost Mobile brand.

31.     In 2019, DISH first sought to enter the wireless market with the stated goal of building a nationwide, first-of-its-kind 5G network.  DISH told the public and investors that it "plan[ned] to deploy a first-of-its-kind 5G network built from the ground up with an architecture that can take full advantage of expected 5G functionality."  DISH sought to commercialize its wireless spectrum licenses through the completion of the nation's first cloud-native, Open Radio Access Network based 5G network.

32.     To achieve this ambitious goal, DISH acquired a substantial portfolio of spectrum licenses, investing over $30 billion in spectrum and related assets, and made public commitments to the FCC to meet aggressive buildout milestones.  DISH's business model depended on rapid, large-scale deployment of its spectrum assets and the ability to offer nationwide wireless service in order to compete with other established carriers such as Verizon, AT&T, and T-Mobile.

33.     In July 2020, DISH—in furtherance of its plan—acquired Boost Mobile from Sprint Corporation for $1.4 billion, officially entering into the retail wireless market.  Boost Mobile is a wireless carrier that offers prepaid and postpaid mobile phone plans.

34.     Following DISH's acquisition of Boost Mobile, DISH's public statements and regulatory filings repeatedly emphasized the need for extensive infrastructure and spectrum to support its 5G ambitions.  As DISH Executive Vice President of Network Development, David Mayo, stated in early 2021, "[s]ecuring strong tower partners . . . is tremendously important for DISH's rapid roll-out of a new, nationwide 5G network."  American Tower became one of those "strong tower partners."

## II.     AMERICAN TOWER AND DISH ENTER INTO THE STRATEGIC COLLOCATION AGREEMENT.

35.     As DISH recognized, it could not successfully operate and build out its 5G network alone.  DISH required a significant amount of wireless tower space to host its equipment in order to transmit signals to its network.

36.     Accordingly, DISH entered into various "collocation agreements" with cell tower companies, including American Tower.  By entering into collocation agreements, DISH leased space on existing infrastructure to house DISH's telecommunications equipment.

37.     American Tower is one of the largest cell tower owners in the world.  American Tower owns, operates, and develops communication real estate, including approximately 42,000 wireless towers throughout the United States.  American Tower leases its physical infrastructure to customers such as DISH to operate their wireless networks.

38.     To facilitate its 5G buildout, on March ██, 2021, DISH entered into the long-term ████████████████████ Strategic Collocation Agreement with American Tower, which gives DISH

10

access to American Tower's nationwide tower infrastructure.  A copy of the SCA is attached hereto

as <u>Exhibit A</u>. ████████████████████████

39.   The SCA grants DISH the right to license space on ████████ of American

Tower's Tower Facilities ("New Licenses") ████████████████████████████████

████████████████████

40.   As part of American Tower's agreement to enter into the SCA, DISH expressly

represented and warranted that ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ DISH further

represented and warranted that ████████████████████████████

████████████████████████████████████████

████████████████████████████████████

41.   In exchange for the use of the Company's Tower Facilities, DISH agreed to pay

American Tower ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

42.   ████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████

43.     Of course, because DISH was embarking on an ambitious buildout of its new network, there was no guarantee at the time that DISH entered into the SCA that its Boost Mobile 5G Network buildout plans would be achieved on its expected timeline, or at all.   DISH nevertheless committed to making the ███████████████████ payments to American Tower ████████████████████████████████

████████████████████

44.     Over the years, American Tower has been a generous and accommodating partner to DISH in its network buildout.   To facilitate DISH's buildout, and based on DISH's stated position that it would become a meaningful fourth carrier, ████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████

45.     ████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████



46. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[2]

47. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ That is exactly what happened here when EchoStar agreed to sell its spectrum licenses to AT&T and SpaceX.

48. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

_____

[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

49. ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████

50. ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████



51. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

52. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

## III.   DISH'S BUILDOUT FAILS TO MEET MILESTONES, AND DISH MERGES WITH ECHOSTAR.

53.    After executing the SCA, DISH's 5G buildout quickly fell behind its public promises and milestone commitments to the FCC.  Despite having the right to deploy equipment on ▮▮▮▮▮ the Company's Tower Facilities nationwide, ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

54.    DISH's under-deployment drew increasing FCC regulatory scrutiny and market skepticism.  DISH failed to meet several spectrum license buildout milestone commitments to the

15

FCC, and its network utilization lagged behind its commitments.  In Form 10-Ks filed with the Securities and Exchange Commission ("SEC") in 2022 and 2023, DISH disclosed that it had not met buildout deadlines for a significant portion of the available spectrum.

55.    On August 8, 2023, as DISH's buildout struggles mounted, DISH Network Corporation, DISH's parent company, announced a merger transaction with EchoStar.  In the announcement of the merger, Charlie Ergen, Chairman of the Board of both DISH Network Corporation and EchoStar, touted "DISH's substantial past investments in spectrum" as contributing to the "strategically and financially compelling combination" of the companies.  That transaction closed on December 31, 2023, making DISH a wholly-owned subsidiary of EchoStar.

56.    Shortly after the transaction closed, DISH's parent, DISH Network Corporation, began transferring a significant portion of its spectrum licenses to its parent EchoStar and its affiliates.  On January 10, 2024, DISH Network Corporation transferred its $12 billion worth of AWS-4, H-Block, CBRS, C-Band, 12GHz, LMDS, 24 GHz, 28 GHz, 37GHz, 39GHz, and 47GHz spectrum licenses to EchoStar Wireless Holding L.L.C., a direct subsidiary of EchoStar, and on March 12, 2024, DISH Network Corporation sold its 700 MHz spectrum licenses to EchoStar for $1 billion.

## IV.   THE FCC INITIATES AN INQUIRY INTO SPECTRUM LICENSES HELD BY ECHOSTAR, AND ECHOSTAR DECIDES TO SELL CERTAIN SPECTRUM LICENSES TO AT&T AND SPACEX.

57.    In May 2025, the FCC initiated an inquiry into the underutilization of EchoStar's spectrum licenses.  On May 9, 2025, FCC Chairman Brendan Carr informed EchoStar that he "asked the FCC's staff to take several steps regarding spectrum licenses that [EchoStar's] companies hold."  Specifically, Chairman Carr directed "agency staff to begin a review of

EchoStar's compliance with its federal obligations to provide 5G service throughout the United States per the terms of its federal licenses."

58. In response, on May 12, 2025, EchoStar Chairman Ergen told the public and investors that EchoStar has "met or exceeded" all of its buildout commitments to the FCC, which EchoStar reiterated in a formal, written response to the FCC on May 27, 2025. In another formal, written submission to the FCC on June 6, 2025, EchoStar wrote that any FCC action to revoke or modify its licenses would be "unlawful, unconstitutional, discriminatory, and utterly baseless."

59. But instead of engaging with the FCC or continuing to invest in the Boost Mobile buildout, EchoStar made a strategic and highly lucrative business decision: EchoStar decided to enter into a series of transactions to sell off key spectrum licenses to third parties.

60. On August 26, 2025, EchoStar announced a definitive agreement to sell its 3.45 GHz and 600 MHz spectrum licenses to AT&T for approximately $23 billion (the "AT&T Transaction"). The AT&T Transaction is expected to close mid-2026, subject to regulatory approval.

61. Then, on September 8, 2025, EchoStar announced that it entered into a definitive agreement to sell its AWS-4 and H-block spectrum licenses to SpaceX for approximately $17 billion (the "SpaceX Transaction"). The SpaceX Transaction is also expected to close mid-2026 and is also subject to regulatory approval. That same day, EchoStar disclosed that the FCC had terminated its inquiry.

62. At no point did the FCC or any other regulatory body (or court) order EchoStar to enter into the Transactions or to dispose of its spectrum licenses. To the contrary, EchoStar made a highly lucrative business decision to sell the spectrum licenses to AT&T and SpaceX. The $40

billion in sales proceeds from the Transactions are expected to generate a substantial profit for EchoStar and leave it, in the words of Mr. Ergen, "cash-rich." To that end, Mr. Ergen told the public and investors that the spectrum licenses were sold not in a fire sale, but at a "market price." And after the AT&T Transaction was announced, AT&T Chief Executive Officer Dan Meyer told the market that he was "well aware that what [AT&T is] paying is more than what [DISH] paid for spectrum at auction." Indeed, according to public reports, AT&T is estimated to be paying a $7 billion premium over what DISH had paid for that spectrum.

63. In addition, even after the Transactions were announced, Mr. Ergen continued to make clear that EchoStar did "not believe that the FCC could [revoke their spectrum licenses]," and that EchoStar "would win the battle" if the FCC had pursued litigation against EchoStar, but was concerned with challenges to business planning in the face of uncertainty over "how long the proceedings" might have taken. In other words, any claim by DISH that it was "forced," "required," or "compelled" to sell its spectrum licenses is belied by the facts and statements of its own most senior leaders.

64. Following the Transactions, EchoStar will continue to hold spectrum assets, including 700 MHz, AWS-3, and CBRS spectrum licenses, with a total current value of over $13 billion. DISH plans to transition Boost Mobile to a hybrid MVNO business after the Transactions, whereby Boost Mobile will offer cell coverage to its customers through network infrastructure leased from other wireless carriers. EchoStar has told the market that operating as a hybrid MVNO will enable Boost Mobile to become "way more competitive" and a "good growth business" after the Transactions.

65.     In light of this transition to an MVNO model, DISH has made the business decision to take steps to begin downsizing Boost Mobile; on August 28, 2025, DISH announced layoffs of approximately 500 employees and other network deployment team members.  According to EchoStar, "[w]ith elements of our network to be decommissioned over time, the company will eventually not house a wireless network deployment workforce."  This decision to transition Boost Mobile to a hybrid MVNO model is, yet again, another business decision solely within the control of EchoStar, DISH, and their affiliates.

## V.     DISH INVENTS CONTRIVED EXCUSES TO ATTEMPT TO EVADE ITS OBLIGATIONS UNDER THE SCA.

66.     Notwithstanding the business decision that EchoStar has made and the substantial profit that it stands to earn for the sale of its spectrum licenses, DISH and EchoStar are now trying to shift the costs and consequences of their spectrum underutilization and business decision-making onto American Tower.

67.     Just weeks after the Transactions were announced, on September 24, 2025, DISH sent American Tower a notice claiming to be excused from its obligations under the SCA. Contrary to the statements of EchoStar's Chairman, DISH claimed that the FCC inquiry left EchoStar with no choice but to "sell certain spectrum licenses or face a wide-ranging license revocation from the FCC," and that the inquiry and subsequent Transactions were "unforeseeable" events that have "frustrated the principal purpose and completely destroyed the value of the [SCA] and DISH Wireless's ability to perform."  A copy of the September 24 Notice is attached hereto as Exhibit B.

68.  DISH's claims in the September 24 Notice are contrived and without basis in fact or law, as detailed above and below. DISH cannot evade its clear and undisputed contractual obligations to American Tower, for multiple reasons.

69.  *First*, contrary to DISH's claim, the events and circumstances giving rise to the FCC inquiry, the Transactions, and any subsequent decision to abandon Boost Mobile's buildout or alter Boost Mobile's business model were entirely foreseeable at the time that the parties entered into the SCA.

a.  

b.  The parties also clearly recognized that meeting DISH's ambitious network buildout could prove difficult,

c.  None of the events and circumstances that DISH cites, which were entirely foreseeable to the parties upon executing the SCA, excuse DISH from performing its obligations under the SCA, whether under the rarely invoked or accepted "frustration of purpose" doctrine or any other legal theory that DISH may seek to invoke or advance.



d. 

Moreover, all of these events—including the delayed buildout that precipitated the FCC inquiry—were squarely within the control of DISH and its affiliates. DISH cannot claim the SCA was frustrated as a result of its own action or inaction.

70. **Second**, DISH's claim that the FCC inquiry left EchoStar with no choice but to sell its spectrum licenses, thereby defeating the purpose of the SCA, is contradicted by the facts and EchoStar's own statements.

a. As detailed above, EchoStar has repeatedly told the public and investors that it would have prevailed in litigation with the FCC and that any action to revoke its spectrum licenses by the FCC would have been "unlawful, unconstitutional, discriminatory, and utterly baseless."

b. It cannot now use that same FCC inquiry to claim that it was forced to sell its spectrum licenses. EchoStar made an intentional business decision to enter into the highly lucrative Transactions, pursuant to which it will earn a significant and multibillion-dollar profit. It cannot escape its obligations under the SCA as a result.

71.  **_Third_**, DISH's claim that the FCC inquiry and subsequent Transactions leave it
unable to perform its obligations under the SCA is also contradicted by the facts and its own
statements.

a.  EchoStar's CEO and President, Hamid Akhavan, has made clear that the Transactions
have "kept [EchoStar] in a marketplace in a very aggressive way without any
limitations to grow and compete," that EchoStar continues to hold spectrum licenses,
and that it still has a "great subscriber base in the marketplace."

b.  Moreover, DISH has made clear that it will operate Boost Mobile as a hybrid MVNO
business after the Transactions, an arrangement that will enable it to continue
generating significant revenue.  In fact, EchoStar has told the market that Boost Mobile
will be "way more competitive" as a hybrid MVNO business, positioning it to continue
generating revenue after the Transactions close.

c.  Accordingly, nothing about the Transactions has prevented DISH from continuing to
pay for and operate at the Tower Facilities.  Indeed, DISH expressly stated in the
September 24 Notice that it did not wish to shut down operations at all Tower Facilities
due to its ongoing operations—in effect, DISH wants to keep the SCA or some form
of collocation agreement in place as to certain Tower Facilities, but not others.  ████

████████████████

72.  Recognizing that its efforts to claim that its performance is excused are contrived
and without basis in fact or law, DISH appears to be positioning itself to evade any future liabilities
or judgment against it.  ████████████████████████

███████████████████ in its September 24 Notice, DISH went out

of its way to state that it "is not entitled to receive any of the spectrum sale proceeds at closing." But regardless of whether the sales proceeds are received by DISH or EchoStar or some other affiliate, nothing about the Transactions prevents DISH from continuing to make payments as required under the SCA. And DISH's suggestion that it will not have sufficient revenue to make such payments is contradicted by DISH's own public statements following the Transactions, including that DISH will be able to make Boost Mobile "way more competitive" after the Transactions by operating it as a hybrid MVNO and that Boost Mobile "will be a challenger brand in the marketplace."

73. To the extent that DISH and EchoStar conspire to prevent DISH from paying American Tower the ███████ fees that have yet to come due under the SCA, whether through the transfer or sale of spectrum licenses to EchoStar, or any concerted decision by EchoStar to strip DISH of assets and leave it judgment-proof, American Tower will hold DISH, EchoStar, and all of their affiliated entities accountable for all damages that it incurs.

74. By letter dated September 26, 2025, American Tower rejected the September 24 Notice and demanded that DISH confirm by no later than September 30, 2025 that it would comply in all respects with its obligations under the SCA. A copy of the September 26 Letter is attached hereto as Exhibit C.

75. By letter dated September 30, 2025, DISH advised American Tower that it would fail to meet American Tower's deadline, instead claiming that it intended to respond later in the week.

76.     On October 3, 2025, DISH responded by reiterating its position that the purpose of the SCA had been frustrated by the FCC inquiry and the Transactions.  A copy of DISH's response is attached as <u>Exhibit D</u>.

77.     Later that day, American Tower responded to DISH, reiterating that DISH's obligations under the SCA were not excused and that full performance by DISH was required.  A copy of American Tower's response is attached as <u>Exhibit E</u>.

78.     As of the date of this Complaint, DISH has not withdrawn any of the positions it has taken in its September 24 Notice and subsequent correspondence and continues to maintain that its obligations under the SCA are excused.

79.     At all times, American Tower has continued to act in good faith and has honored its ongoing obligations under the SCA.

80.     Based on the foregoing, an actual controversy exists between American Tower and DISH regarding the parties' rights and obligations under the SCA and whether DISH remains obligated to perform its obligations thereunder.

81.     DISH and American Tower have a continuing business relationship under the SCA, and the existence of this dispute threatens to impair this relationship and cause substantial harm to American Tower.  DISH's conduct establishes that it plans to refuse to perform as required under the SCA and will deprive American Tower of the benefit of its bargain, including ███████ fees that will become due to American Tower during the course of the parties' contract.

82.     The Court can resolve this controversy by issuing a declaratory judgment determining the rights, obligations, and liabilities of the parties.

83.     Accordingly, American Tower is entitled to a declaration confirming that DISH has not been excused from performing its obligations under the SCA, that the SCA remains in full force and effect, and that DISH remains obligated to perform all of its obligations under the SCA.

## DECLARATORY JUDGMENT
### (COUNT I)

84.     American Tower incorporates the foregoing allegations by this reference.

85.     On March ▮, 2021, American Tower and DISH entered into the SCA.

86.     Under the terms of the SCA, American Tower provided DISH with the right to license space on American Tower's Tower Facilities in exchange for certain monetary payments.

87.     On September 24, 2025, DISH purported to notify American Tower that "the FCC's actions and the resulting spectrum sales have frustrated the principal purpose and completely destroyed the value of the [SCA] and [DISH's] ability to perform.  As a result, [DISH's] obligations are excused."

88.     On September 26, 2025, American Tower responded by rejecting DISH's notice and maintaining that the SCA remains in full force and effect, that DISH remains obligated to perform all of its obligations under the SCA, and demanding that DISH confirm that the SCA remains in full force and effect and that DISH will continue to comply with all of its contractual obligations.

89.     On September 30, 2025, DISH failed to meet American Tower's deadline and claimed that it would respond later that same week.

90.     On October 3, 2025, DISH responded by reiterating its position that the purpose of the SCA was frustrated by the FCC inquiry and the Transactions.

91.    Later that day, American Tower reiterated to DISH that its obligations were not excused under the SCA and that full performance was required.

92.    As of the date of this Complaint, DISH has not withdrawn any of the positions it took in its September 24 Notice and has taken in subsequent correspondence and continues to maintain that its obligations under the SCA are excused.

93.    An actual and substantial controversy exists between the parties regarding their rights and obligations under the SCA and whether DISH remains obligated to perform its obligations under the SCA, or whether the business decision to sell EchoStar's spectrum licenses in connection with the Transactions (or any other facts or circumstances) has excused DISH from its obligations under the SCA.  This controversy is ongoing and justiciable.

94.    This dispute is immediate and real because DISH has advised American Tower that it believes that its obligations under the SCA have been excused, while American Tower maintains that DISH's obligations have not been excused and that the SCA remains in full force and effect, and that DISH must continue to perform its obligations thereunder, including by continuing to make all payments to American Tower required under the SCA for the entire remainder of the contract's term.

95.    Accordingly, pursuant to 28 U.S.C. §§ 2201 and 2202, American Tower is entitled to a declaration confirming that DISH has not been excused from performing its obligations under the SCA, that the SCA remains in full force and effect, and that DISH remains obligated to perform all of its obligations under the SCA.

96.    Such declaration would resolve the present controversy.

## PRAYER FOR RELIEF

97.     WHEREFORE, American Tower is entitled to a judgment against DISH:

    i.    Declaring that DISH has not been excused from performing its obligations under the SCA, that the SCA remains in full force and effect, and that DISH remains obligated to perform all of its obligations under the SCA;

    ii.    Awarding American Tower its costs in this action, and reasonable attorneys' fees;

    iii.    Awarding any other and further relief as the Court deems just and appropriate.

Dated: October 20, 2025

Respectfully submitted,

*/s/ Heather Carson Perkins*
Heather Carson Perkins
FAEGRE DRINKER BIDDLE & REATH LLP
1144 Fifteenth Street, Suite 3400
Denver, CO 80202
(303) 607-3500
heather.perkins@faegredrinker.com

David B. Hennes (admission forthcoming)
Andrew S. Todres (admission forthcoming)
ROPES & GRAY LLP
1211 Sixth Avenue
New York, NY 10036
(212) 596-9000
david.hennes@ropesgray.com
andrew.todres@ropesgray.com

Dominique R. Rioux (admission forthcoming)
Christopher M. Durham (admission forthcoming)
Rory T. Skowron (admission forthcoming)
ROPES & GRAY LLP
800 Boylston Street
Prudential Tower
Boston, MA 02199

(617) 951-7000
dominique.rioux@ropesgray.com
christopher.durham@ropesgray.com
rory.skowron@ropesgray.com

*Attorneys for Plaintiffs American Towers LLC,*
*SpectraSite Communications, LLC, and InSite*
*Wireless Group*

*Plaintiffs' Address:*
116 Huntington Avenue, 11th Floor
Boston, MA 02116

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

AMERICAN TOWERS LLC,
SPECTRASITE COMMUNICATIONS, LLC,
and INSITE WIRELESS GROUP, LLC,

      Plaintiffs,

v.

DISH WIRELESS L.L.C.,

      Defendant.

---

### EXHIBIT A (RESTRICTED) — ORIGINAL TO BE FILED UNDER RESTRICTION

---

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

AMERICAN TOWERS LLC,
SPECTRASITE COMMUNICATIONS, LLC,
and INSITE WIRELESS GROUP, LLC,

      Plaintiffs,

v.

DISH WIRELESS L.L.C.,

      Defendant.

---

### EXHIBIT B (REDACTED) — ORIGINAL TO BE FILED UNDER RESTRICTION

---

September 24, 2025

American Towers LLC
c/o American Tower Corporation
Attention: Legal Department
10 Presidential Way
Woburn, MA 01801

with a copy to:
American Towers LLC
c/o American Tower Corporation
Attention: Legal Department
116 Huntington Ave., 11th Floor
Boston, MA 02116

Reference: STRATREGIC COLLOCATION AGREEMENT between American Towers LLC, SpectraSite Communications, LLC, InSite Wireless Group, LLC (collectively, "ATC") and DISH Wireless L.L.C. ("DISH Wireless") dated March ▮, 2021 (the "Agreement")

Since 2020, working with you and our other partners, we successfully built the nation's first 5G Open RAN network, meeting our buildout milestones. As you likely know, in May 2025, the Federal Communications Commission (the "FCC") announced it had begun an investigation into reversing prior grants of license authority to DISH Wireless's ultimate parent corporation, EchoStar Corporation, and its subsidiaries (collectively, "EchoStar") with respect to certain of EchoStar's spectrum licenses. During ensuing discussions, the FCC made clear that EchoStar's utilization of its spectrum was unacceptable given the small number of Boost Mobile subscribers on its network. The FCC further made clear that EchoStar's continued ownership of such spectrum licenses failed to best serve the public interest and that EchoStar needed to sell certain spectrum licenses or face a wide-ranging license revocation by the FCC. Either way, EchoStar would have had to abandon its longstanding business plan for Boost Mobile.

Accordingly, EchoStar entered into a series of transactions that will, over time, result in the decommissioning of our Boost Mobile radio access network. Specifically, on August 26, 2025 and September 7, 2025, respectively, EchoStar Corporation and certain of its subsidiaries entered into agreements to sell 3.45 GHz and 600 MHz spectrum licenses to AT&T and AWS-4 and H-block spectrum licenses to SpaceX. FCC Chairman Carr then directed FCC staff to bring the agency's investigation to conclusion, finding that, among other things, EchoStar has satisfied its buildout and other related obligations. DISH Wireless is not a party to the AT&T or SpaceX agreements, does not own the spectrum licenses being sold to AT&T or SpaceX, and is not entitled to receive any of the spectrum sale proceeds at closing.

The Agreement and all of the Tower Facilities (as defined in the Agreement) have been impacted by these unforeseeable actions by the FCC taken outside of DISH Wireless's control. As such, we are writing to inform you that the FCC's actions and the resulting spectrum sales have frustrated the principal purpose and completely destroyed the value of the Agreement and DISH Wireless's

ability to perform. As a result, DISH Wireless's obligations are excused. This letter will serve as notice under the Agreement of the events described herein, to the extent required, including without limitation ███████████████████████████, without waiver of any rights, remedies, defenses and positions with respect to DISH Wireless's rights and obligations under the Agreement and under law and equity, and all such rights, remedies, defenses and positions are expressly reserved.

Despite the occurrence of these events, DISH Wireless needs to continue to operate certain Tower Facilities (as defined in the Agreement) for a period of time. We intend to promptly engage in discussions with you to reach an agreement regarding the appropriate amount that DISH Wireless will pay ATC during this transition period for ATC's continued performance under the Agreement.

We also acknowledge receipt of your letter to DISH Wireless dated September 12, 2025. We are reviewing the letter and considering our response in light of our current circumstances. We will respond within the time frame requested in the letter.

Sincerely,

*[signature]*
John Swieringa (Sep 24, 2025 21:45:24 MDT)

John Swieringa
President, Technology & Chief Operating Officer
DISH Wireless L.L.C.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

AMERICAN TOWERS LLC,
SPECTRASITE COMMUNICATIONS, LLC,
and INSITE WIRELESS GROUP, LLC,

      Plaintiffs,

v.

DISH WIRELESS L.L.C.,

      Defendant.

---

## EXHIBIT C (REDACTED) — ORIGINAL TO BE FILED UNDER RESTRICTION

---



ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

September 26, 2025

David B. Hennes
T +1 212 596 9395
david.hennes@ropesgray.com

**BY EMAIL AND CERTIFIED MAIL**

John Swieringa
President, Technology & Chief Operating Officer
DISH Wireless L.L.C.
P.O. Box 6655
Englewood, Colorado 80155

Re:    DISH Wireless, LLC Letter Dated September 24, 2025

Mr. Swieringa:

We represent American Tower (as defined herein). We are in receipt of your notice, dated September 24, 2025 (the "Notice"), in which DISH purports to be excused from its obligations under the Strategic Collocation Agreement by and between DISH Wireless L.L.C. and American Towers LLC, SpectraSite Communications, LLC, and InSite Wireless Groups, LLC (collectively, "American Tower"), dated March █, 2021 (the "SCA").[1] As detailed herein, the Notice does not come close to articulating any non-frivolous grounds for terminating or otherwise excusing DISH's obligations under the SCA. Accordingly, American Tower rejects the Notice in its entirety. The SCA remains in full force and effect, and American Tower demands that you comply with your obligations thereunder.

In particular, the Notice claims that certain investigatory actions taken by the Federal Communications Commission ("FCC") relating to the utilization of spectrum licenses held by EchoStar Corporation[2] and its subsidiaries ("EchoStar") left EchoStar with no choice but to "sell certain spectrum licenses or face a wide-ranging license revocation from the FCC," and that that investigation, together with subsequent transactions entered into by EchoStar to sell certain spectrum licenses to AT&T and SpaceX (the "Transactions"), have "frustrated the principal purpose and completely destroyed the value of the [SCA] and DISH Wireless's ability to perform." The Notice further claims that the events culminating in those Transactions were "unforeseeable" and "outside of DISH['s] control." These claims are directly contradicted by the factual record—including

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the SCA.

[2] EchoStar is "DISH's ultimate parent company." Notice at 1.

ROPES & GRAY LLP

- 2 -                                                                September 26, 2025

EchoStar's own actions and statements— ███████████████████████████
████████████████████████████████████████████████████████████████████

     ***DISH cannot be excused from performance based on its parent's voluntary business decision to sell certain spectrum licenses for a substantial profit.***  As an initial matter, your claim that the FCC investigation left EchoStar with no choice but to sell its spectrum licenses, thereby defeating the purpose of the SCA, is contradicted by EchoStar's own statements.  EchoStar Chairman Charlie Ergen has clearly stated that "EchoStar and Boost Mobile have met all of the FCC's network buildout milestones,"[3] and that EchoStar does "not believe that the FCC could [revoke their spectrum licenses]" and that EchoStar "would win the battle" if the FCC had pursued litigation against EchoStar.[4]  To that end, as Mr. Ergen has stated, the spectrum licenses were not sold in a fire sale, but at a highly-profitable "market price."[5]  AT&T's chief executive officer has conceded that he is "well aware that what [AT&T is] paying is more than what [DISH] paid for spectrum at auction."[6]  In short, EchoStar could have challenged any FCC action, but instead made an intentional business decision to enter into the Transactions, pursuant to which it earned a significant profit.  DISH cannot now turn around and complain that the purpose of the SCA has been frustrated because its parent company undertook a business decision that had the potential effect of reducing DISH's need for space on the Tower Facilities.

     ***In any event, the possibility that DISH or EchoStar could lose or sell spectrum licenses was entirely foreseeable*** ██████  ████████████████████████████████████████
████████████████████  ████████████████████████████████████████

---

[3] *EchoStar Announces Spectrum Sale and Hybrid Mobile Network Operator (MNO) Agreement, Steps Toward Resolving Federal Communications Commission's (FCC) Inquiries*, PRNEWSWIRE (Aug. 26, 2025) https://ir.echostar.com/news-releases/news-release-details/echostar-announces-spectrum-sale-and-hybrid-mobile-network.

[4] *EchoStar Corporation (SATS) Discusses On Pioneering What's Next: EchoStar's Vision And Strategy Call (Transcript)*, SEEKING ALPHA (Sept. 15, 2025) https://seekingalpha.com/article/4822911-echostar-corporation-sats-discusses-on-pioneering-whats-next-echostars-vision-and-strategy-call-transcript.

[5] *See supra* note 4.

[6] Dan Meyer, *AT&T CEO admits to high price for EchoStar spectrum*, SDXCENTRAL (Sept. 3, 2025) https://www.sdxcentral.com/news/att-ceo-admits-to-high-price-for-echostar-spectrum/#%3A~%3Atext=%E2%80%9CI%27m%20well%20aware%20that%20what%20we%27re%20paying%20is%2Cduring%20a%20conference%20call%20following%20the%20deal%E2%80%99s%20unveiling.

ROPES & GRAY LLP

- 3 -                                    September 26, 2025

[REDACTED]

The Transactions were entirely foreseeable and within your control, [REDACTED]

*In fact, the purpose of the SCA has not been frustrated, and DISH remains able to perform*. EchoStar's CEO, President & Director, Hamid Akhavan has made clear that the Transactions have "kept us in a marketplace in a very aggressive way without any limitations to grow and compete," and that EchoStar continues to own spectrum and still has a "great subscriber base in the marketplace."[7] At this juncture, nothing prevents DISH from continuing to perform its obligations under the SCA—and indeed, your Notice expressly acknowledges that DISH desires to continue to operate at the Tower Facilities for a period of time.

Nor is there any reason that DISH cannot continue to comply with its payment obligations under the SCA. We note with concern your statement that DISH "is not entitled to receive any of the spectrum sale proceeds at closing." Nothing about the Transactions prevents DISH from continuing to make payments as required under the SCA—and that is especially so, given that its parent will be receiving over $30 billion in sales proceeds. There was also no requirement by the FCC or otherwise that DISH transfer its spectrum licenses to EchoStar. Indeed, the only reasonable conclusion to be drawn from the facts detailed herein is that the licenses were fraudulently conveyed out of DISH for the express purpose of leaving DISH unable to satisfy its obligations under the SCA. Please be advised that we will hold DISH, EchoStar, and all relevant affiliates accountable for any efforts to obstruct or hinder American Tower's right to payment under the SCA.

\* \* \* \* \*

For all of these reasons American Tower rejects DISH's Notice in its entirety. The SCA, including all of DISH's obligations thereunder, remain in full force and effect. Please confirm

---

[7] *See supra* note 4.

ROPES & GRAY LLP

- 4 -                                                          September 26, 2025

immediately that DISH will honor those obligations.  We look forward to your prompt response, but in all events no later than close of business on Tuesday, September 30.

As to your request to engage in discussions, American Tower is willing to engage in discussions with DISH with regard to its continued obligations under the SCA and expects that any such discussions would occur on an expedited basis.  In all events, nothing about those potential discussions or this letter shall be construed as a waiver or forbearance of American Tower's rights, all of which are expressly reserved and which American Tower is prepared to enforce expeditiously. American Tower hereby demands that DISH and all of its affiliated entities preserve all documents and communications of any kind or nature that may be relevant to this matter including, but not limited to, all documents regarding the SCA, the transfer of spectrum licenses by EchoStar, the Transactions, and all other matters related to or described in the Notice or this letter.[8]

Sincerely,

*/s/ David B. Hennes*

cc:     Richard Rossi, Esq. (richard.rossi@americantower.com)

---

[8] We expect the contents of DISH's documents to be consistent with the public statements that DISH has made to the markets—which are inconsistent with the positions taken in the Notice.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

AMERICAN TOWERS LLC,
SPECTRASITE COMMUNICATIONS, LLC,
and INSITE WIRELESS GROUP, LLC,

      Plaintiffs,

v.

DISH WIRELESS L.L.C.,

      Defendant.

---

## EXHIBIT D (REDACTED) — ORIGINAL TO BE FILED UNDER RESTRICTION

---

**WHITE & CASE**

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
**T** +1 212 819 8200

**whitecase.com**

October 3, 2025

David B. Hennes
Ropes & Gray LLP
1211 Avenue of the Americas
New York NY 10036-8704

Re:     **Strategic Collocation Agreement by and between DISH Wireless and American
        Towers LLC, SpectraSite Communications, LLC and InSite Wireless Groups, LLC,
        dated March ▮▮ 2021**

Dear David:

Further to my letter dated September 29, 2025, we write on behalf of DISH Wireless L.L.C.
("DISH Wireless") in response to your letter on behalf of American Towers LLC, SpectraSite
Communications, LLC, and InSite Wireless Groups, LLC (collectively, "American Tower"), dated
September 26, 2025 (the "Letter").  The assertions in the Letter are wrong.  While we do not
believe it would be productive to address each of them, we will address some of your errors.

*First*, your Letter is premised on a fundamental error in inaccurately asserting that EchoStar
voluntarily sold the spectrum.  The relevant party here is DISH Wireless, the counterparty to the
Strategic Collocation Agreement by and between DISH Wireless and American Tower, dated
March ▮▮ 2021 (the "SCA"), and DISH Wireless did not own, nor did it sell, the spectrum at issue.
The spectrum licenses were sold by EchoStar Corporation and certain of its subsidiaries.  Neither
DISH Wireless nor any of its subsidiaries held or previously held such spectrum, were parties to
the transaction, or took any action in connection with these sales.  Thus, contrary to your assertions,
DISH Wireless had no control over the actions of the Federal Communications Commission
("FCC") or the sale of spectrum.

*Second*, your assertion that EchoStar's sale of its spectrum licenses was a "voluntary business
decision" (Ltr. at 2) also is wrong.  Your selective citations to fragmented public statements
misstate the record.  The FCC required EchoStar to sell or forfeit the spectrum, so EchoStar's sale
was involuntary and unavoidable.

*Third*, the FCC's actions were not "contemplated" or "foreseeable."  EchoStar invested billions of
dollars into its spectrum and network buildout, which it would not have done if it expected to lose
the spectrum notwithstanding meeting its license conditions.  Furthermore, there is no prior
instance of the FCC pursuing this course of conduct, so the FCC's unprecedented actions here
plainly were unforeseeable.  The parties likewise did not contemplate this FCC action against all
of the necessary spectrum.



David B. Hennes
October 3, 2025

*Fourth*, your assertion that the purpose of the SCA has not been frustrated is wrong. The purpose of the SCA was to lease or license certain ground and airspace and infrastructure from American Tower for DISH Wireless's buildout and deployment of a wireless 5G network using wireless spectrum licenses. Operationalizing DISH Wireless's spectrum was the *entire* purpose of the parties' contractual relationship, and that purpose was frustrated when the FCC required EchoStar to sell or forfeit the necessary spectrum. Without the spectrum, there is no remaining purpose for the SCA, nor is there an ability to perform. Your focus on statements that EchoStar continues to have a business misses the issue here. EchoStar is not party to the SCA, so its business is irrelevant to the SCA. In any event, EchoStar also will no longer have the spectrum or any use for the sites and infrastructure leased under the SCA following the forced sale of spectrum, and your statements about EchoStar's *other businesses* are irrelevant because those businesses have nothing to do with the purpose of the SCA.

*Fifth*, your threat to pursue a fraudulent transfer claim is frivolous. DISH Wireless never owned the spectrum, and did not transfer it.

*Sixth*, American Tower's focus on EchoStar and the sale proceeds to EchoStar is misplaced. American Tower contracted with DISH Wireless, not the owner of the spectrum. DISH Wireless has no ability to pay for the towers it cannot use. Your assertion that a different entity, not party to the SCA, and with no obligations under the SCA, could pay makes no sense.

\*

Notwithstanding the foregoing, DISH Wireless continues to believe that a commercial resolution with American Tower is the best path forward, and looks forward to a discussion about these matters with the appropriate business executives. Please provide us with some dates and times for a discussion, and who American Tower proposes to have participate.

DISH Wireless reserves all of its claims, rights, positions, defenses and remedies available to it under law and in equity, and waives none.

Sincerely,

Glenn M. Kurtz

cc:   John Swieringa, President, Technology & COO, DISH Wireless
       Dean Manson, Esq.
       Joshua Weedman, Esq.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

AMERICAN TOWERS LLC,
SPECTRASITE COMMUNICATIONS, LLC,
and INSITE WIRELESS GROUP, LLC,

      Plaintiffs,

v.

DISH WIRELESS L.L.C.,

      Defendant.

---

## EXHIBIT E (REDACTED) — ORIGINAL TO BE FILED UNDER RESTRICTION

---



**ROPES & GRAY LLP**
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

October 3, 2025

David B. Hennes
T +1 212 596 9395
david.hennes@ropesgray.com

**BY EMAIL**

Glenn M. Kurtz, Esq.
White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
gkurtz@whitecase.com

Re: DISH Wireless, LLC Letter Dated October 3, 2025

Dear Glenn:

We are in receipt of your letter, dated October 3, 2025, which is a continuation of DISH's efforts to evade its clear and undisputed contractual obligations to American Tower under the SCA.[1] Most tellingly, your letter does not even reference ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[2]

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the SCA, DISH's September 24, 2025 Notice purporting to be excused from its obligations under the SCA (the "September 24 Notice"), or American Tower's September 26, 2025 rejection of the September 24 Notice.

[2] We reject each of the arguments in your letter, and our silence in response to any point should not be construed as a concession. We do note, however, that the distinctions you are attempting to draw between EchoStar and DISH, its wholly-owned subsidiary, ████████████████████████████ , but also nonsensical and internally inconsistent. For instance, you state that EchoStar's "business is irrelevant to the SCA." But that claim is belied by numerous other claims in your letter, including your statement that "entire purpose" of the SCA—to "operationaliz[e] *DISH Wireless's* spectrum"—was "frustrated" when the "FCC required *EchoStar* to sell or forfeit the necessary spectrum." Of course, it is beyond dispute that EchoStar controls DISH, and that the

ROPES & GRAY LLP

- 2 -                                                    October 3, 2025

     Notwithstanding the manifest weakness of DISH's positions, American Tower is amenable to engaging in discussions with DISH to try to reach a commercial resolution.  American Tower expects that those discussions will commence this coming week of October 6, 2025, and is available for a call between 11:00 am and 1:00 pm EDT on Thursday, October 9.

     In the event DISH is not prepared to engage reasonably or constructively regarding a resolution, then American Tower will immediately enforce its rights and remedies, all of which are expressly reserved.  To that end, we again demand that you immediately confirm that DISH and its affiliated entities are preserving all documents regarding the SCA, the spectrum licenses, the Transactions, and all other matters described in the parties' recent correspondence, which confirmation was noticeably absent from your letter despite our repeated requests.

Very truly yours,

*/s/ David B. Hennes*
David B. Hennes

cc:    Rich Rossi (richard.rossi@americantower.com)
      John Swieringa (John.swieringa@dish.com)
      Dean Manson (Dean.Manson@echostar.com)

-------------------------

Transactions will divest EchoStar of spectrum used by DISH to operate on American Tower's Tower Facilities.  In all events, DISH cannot use EchoStar's decision to enter into the Transactions as a cover to escape its obligations to American Tower under the SCA.

JS 44 (Rev. 11/15) District of Colorado Form

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

American Towers LLC; SpectraSite Communications, LLC; and InSite Wireless Group, LLC

**(b)** County of Residence of First Listed Plaintiff   Suffolk County, MA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Faegre Drinker Biddle & Reath LLP, 1144 Fifteenth Street, Suite 3400, Denver CO 80202
(303) 607-3500

## DEFENDANTS

DISH Wireless L.L.C.

County of Residence of First Listed Defendant   Arapahoe County, CO
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(a)

Brief description of cause:
Declaratory Judgment as to contract obligations                          ☐ AP Docket

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
10/20/2025

SIGNATURE OF ATTORNEY OF RECORD
/s/ Heather Carson Perkins

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____