# Defendant's Exhibit C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:25-cv-03756-NYW-CYC

Aircomm of Avon, LLC; Atlantic Coast Communications LLC; CCATT LLC; CCTMO
LLC; CCTM1 LLC; CCTM2 LLC; Coverage Plus Antenna Systems LLC; Crown
Atlantic Company LLC; Crown Castle Fiber LLC; Crown Castle GT Company LLC;
Crown Castle MU LLC; Crown Castle South LLC; Crown Castle Towers 05 LLC;
Crown Castle Towers 06-2 LLC; Crown Castle Towers 09 LLC; Crown Castle USA
Inc.; Crown Communications LLC; Global Signal Acquisitions LLC; Global Signal
Acquisitions II LLC; Global Signal Acquisitions III LLC; Global Signal Acquisitions IV
LLC; GoldenState Towers, LLC; High Point Management Co. LLC; ICB Towers, LLC;
Interstate Tower Communications LLC; IntraCoastal City Towers LLC; Pinnacle
Towers Acquisition LLC; Pinnacle Towers Asset Holding LLC; Pinnacle Towers LLC;
Pinnacle Towers III LLC; Radio Station WGLD LLC; Shaffer & Associates, Inc.; Sierra
Towers, Inc.; Tower Development Corporation; Tower Systems LLC; Tower
Technology Company of Jacksonville LLC; Tower Ventures III, LLC; WCP Wireless
Lease Subsidiary, LLC; and TVHT, LLC,

         Plaintiffs,

v.

DISH Wireless L.L.C.; DISH Purchasing Corporation; and EchoStar Corporation,

         Defendants.

**DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING DECISION BY THE
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

## CERTIFICATE OF CONFERRAL

Pursuant to the Honorable Nina Y. Wang Uniform Civil Practice Standard 7.1B(b), counsel for Defendants conferred with counsel for Plaintiffs regarding the requested relief to assess whether the parties could agree to a stay of this action pending resolution of Defendants' Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407.  Counsel for Plaintiffs ("Crown Castle") indicated that they oppose the motion.

## AI CERTIFICATION

Pursuant to the Court's Standing Order Regarding the Use of Generative Artificial Intelligence in Court Filings, undersigned counsel certifies that generative artificial intelligence was not used to draft this filing

Defendants DISH Wireless L.L.C. ("DISH Wireless"), DISH Purchasing Corporation ("DISH Purchasing"), and EchoStar Corporation ("EchoStar" and together with DISH Wireless and DISH Purchasing, "Defendants"), by and through their undersigned counsel, hereby respectfully move the Court to stay all proceedings in the above-captioned action pending resolution of Defendants' Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407 (the "MDL Motion"), filed with the Judicial Panel on Multidistrict Litigation (the "JPML" or "Panel") on March 2, 2026. *See* Exhibit A, MDL Case No. 3182, ECF No. 3.

## INTRODUCTION

Beginning in 2019, DISH Wireless (and certain of its affiliates) began working to deploy a nationwide, first-of-its-kind cloud-native Open Radio Access Network-based 5G network. First Amended Complaint (the "FAC") ¶¶ 1, 54, ECF No. 39. That network relied on a portfolio of spectrum licenses and related assets that EchoStar, and certain of its affiliates (not including DISH Wireless) (collectively, the "EchoStar Group"), had acquired over a ten-year period, at a cost of over $30 billion, and to which EchoStar Group permitted DISH Wireless access. *Id.* ¶ 58. In order to facilitate the 5G network buildout and operation, DISH Wireless entered into numerous contracts with owners and operators of communications towers throughout the nation, as well as providers of network equipment or services, to secure access to the tower and network infrastructure necessary to operationalize the spectrum for subscribers to its Boost Mobile brand. As part of that initiative, in November 2020 DISH Wireless and Crown Castle (except for Crown Castle Fiber LLC and Crown Castle USA Inc.) entered into the Master Lease

Agreement, (*id.* ¶ 126); in December 2020, DISH Wireless and Crown Castle Fiber LLC entered into the Master Product Agreement, (*id.* ¶ 71); and in May 2020, DISH Purchasing and Crown Castle USA Inc. entered into the Deployment Services Agreement (the "DSA") *(id.* ¶ 161).

By 2025, EchoStar Group had timely satisfied all applicable commitments to the Federal Communications Commission (the "FCC") relating to the relevant spectrum licenses. *Id.* ¶¶ 78, 93. But on May 9, 2025, the Chairman of the FCC sent a letter to EchoStar stating, among other things, that the FCC had initiated a review of EchoStar's licenses to provide 5G service in the United States and threatened the "loss of spectrum licenses and significant financial payments." *Id.* ¶ 79 n.11. The FCC's actions were unprecedented and unforeseeable and ultimately required EchoStar Group to sell the relevant spectrum licenses, or have the licenses revoked. *Id.* ¶ 79. There has never been another instance where the FCC directed a similar license holder to either sell or forfeit its spectrum licenses nationwide.

As a result of the FCC's unprecedented and unforeseeable actions, which were unrelated to any of EchoStar Group's or DISH Wireless's obligations to the FCC, EchoStar Group was required to sell certain of its spectrum licenses to SpaceX and AT&T (the "Required Sales Transactions"). *Id.* ¶¶ 83–85. The Required Sales Transactions make it impossible for DISH Wireless to continue to build, operate, or pay for a wireless network. *See* FAC, Exs. C, D; ECF Nos. 39-3, 39-4. The purpose of DISH Wireless's contracts with the Towers Providers was completely frustrated, and DISH Wireless's performance under the contracts themselves was rendered commercially impractical,

indeed impossible. *See id.* The FCC's actions, and the resulting Required Sales Transactions, were a force majeure event.

Against that backdrop, over the past four months, DISH Wireless has been sued by owners and operators of communications towers throughout the nation, as well as providers of network equipment or services, in over a dozen related federal and state lawsuits, including this action, each based on substantially similar allegations and claims, namely that DISH Wireless allegedly breached or defaulted on its obligations under various lease and service agreements by failing to make certain payments allegedly owed under those contracts, notwithstanding the fact that DISH Wireless no longer has access to the spectrum licenses that were being carried on the towers.

On March 2, 2026, Defendants filed the MDL Motion requesting that the Panel transfer this action, as well as six other related actions that are pending in federal district courts around the country,[1] to the District of Colorado for coordinated proceedings before this Court or, in the alternative, before the Honorable S. Kato Crews, who presides over *American Towers*.[2] *See* MDL Case No. 3182, ECF No. 3. Defendants are likely to prevail

---

[1] *See American Towers LLC, et al. v. DISH Wireless LLC*, Case No. 1:25-cv-03311 (D. Colo. Oct. 20, 2025) ("*American Towers*"); *DataVerge LLC v. DISH Wireless LLC*, Case No. 26-cv-1168 (E.D.N.Y. Feb. 27, 2026) ("*DataVerge*"); *Seidner Properties LP v. DISH Wireless LLC*, Case No. 8:26-cv-00082 (C.D. Ca. Jan. 9, 2026) ("*Seidner*"); *Royal Group Plaza, LLC v. DISH Wireless LLC*, Case No. 2:26-cv-01092 (C.D. Cal. Feb. 3, 2026) ("*Royal Group*"); *Sabre Industries, Inc. v. DISH Wireless Leasing LLC*, Case No. 1:26-cv-00209 (S.D.N.Y. Jan. 12, 2026) ("*Sabre*"); and *SBA Telecommunications, LLC, et al. v. DISH Wireless LLC*, Case No. 1:26-cv-00218 (W.D.N.Y. Feb. 5, 2026) ("*SBA*").

[2] Since Defendants moved the Panel for transfer and consolidation on March 2, 2026, DISH Wireless and EchoStar have been served with an additional complaint filed in the District of Colorado, which will also be subject to the request for consolidation. *See Comcast Business Communications, LLC v. DISH Wireless LLC*, Case No. 1:26-cv-00824 (D. Colo. Feb. 27, 2026) (Varholak, M.J.).

3

on the MDL Motion because all seven related actions rest on the same fundamental factual questions, such as: Did the FCC require EchoStar to divest its spectrum assets? Were the Required Sales Transactions "voluntary" business decisions, or were they required by the government?  Was EchoStar's potential loss of its spectrum licenses contemplated or foreseeable to DISH Wireless when it entered its contracts with the Towers Providers?  And, ultimately, did the FCC's actions, and the resulting Required Sales Transactions make it impossible for DISH Wireless to build, operate, or pay for a 5G wireless network?  *See* Exhibit A, ECF No. 3-1, at 2-3.  The District of Colorado is also the most likely venue for the consolidated proceedings because it is, among other considerations, the location of all defendants, the majority of the alleged conduct, and the most related actions (three federal cases and four state actions).  *Id.* at 3.

For the reasons set forth below, this case should be stayed pending a determination by the Panel on the MDL Motion.  Staying this case pending the Panel's decision on the MDL Motion will preserve the Court's and parties' resources by ensuring that the parties conduct discovery just once, after all cases have been consolidated before this Court or another court.

Since Defendants filed the MDL Motion on March 2, 2026, courts in two of the related actions have already issued stays of all proceedings pending the Panel's decision, upon request of the parties.  *See Seidner*, ECF No. 23, *Order Granting Joint Stipulation for Stay of Proceedings*; *Dataverge*, ECF No. 10, *Order Granting Joint Stipulation Regarding Stay of All Proceedings*.

4

## PROCEDURAL BACKGROUND

This case is in its nascent stages. The operative complaint was just filed on January 30, 2026, *see* ECF No. 39, and Defendants responded to the FAC on March 6, 2026. EchoStar filed a Motion to Dismiss, *see* ECF No. 71, and DISH Wireless and DISH Purchasing filed an Answer denying all allegations and pleading ten affirmative defenses. *See* ECF No. 70.

On February 17, 2026, Plaintiffs served their First Set of Requests for Production to DISH Wireless, and on February 27, 2027, Plaintiffs also served: (i) Plaintiffs' First Requests for Production to DISH Purchasing; (ii) Plaintiffs' First Requests for Production to EchoStar; (iii) Plaintiffs' First Interrogatories to DISH Wireless; (iv) Plaintiffs' First Interrogatories to DISH Purchasing; and (v) Plaintiffs' First Interrogatories to EchoStar. Neither party has noticed a deposition, and the parties are still over seven months away from the discovery cutoff. *See* Scheduling Order at 11, ECF No. 60.

## ARGUMENT

As a general matter, "courts frequently grant stays pending a decision by the [Panel] regarding whether to transfer a case." *Bunnell Bunnell v. Future Motion, Inc.*, No. 22-cv-01220, 2023 WL 7279354, at *1 (D. Colo. Nov. 3, 2023) ("[T]he Court has been unable to find … a single case from within the District of Colorado denying a stay where a motion to transfer proceedings is pending before the JPML. Rather, stays are routinely granted under the same or similar circumstances."). Courts regularly exercise their "broad discretion" to "control [their] own docket" in these circumstances because the "interests of judicial economy are best served by granting a stay pending [a] MDL Panel's decision." *Cheney v. Eli Lily & Co.*, No. 14-cv-02249, 2014 WL 7010656, at *1 (D. Colo.

5

Dec. 9, 2014); *Lundy v. C.B. Fleet Co., Inc.*, No. 09-cv-00802, 2009 WL 1965521, at *1 (D. Colo. July 6, 2009).

In determining whether to grant a stay of all proceedings pending the Panel's decision on transfer and consolidation, courts in this district consider: "(1) the interest of the plaintiff in proceeding expeditiously with discovery and the potential prejudice to the plaintiff of a delay; (2) the burden on the defendant; (3) the convenience to the Court of staying discovery; (4) the interests of non-parties in either staying or proceeding with discovery; and (5) the public interest in either staying or proceeding with discovery." *Sykes v. LivaNova Deutschland GmbH*, No. 17-cv-02437, 2018 WL 286791, at *1 (D. Colo. Jan. 4, 2018) (citing *String Cheese Incident v. Stylus Shows, Inc.*, No. 1:02-CV-01934, 2006 WL 894955, at *2 (D. Colo. Mar. 30, 2006)).  Each of these factors weighs in favor of a stay of this action.

## A.    A Temporary Stay Of Proceedings Will Not Prejudice Plaintiffs

A temporary stay of this action will not cause any particularized or specific prejudice to Plaintiffs or their ability to conduct discovery.  Plaintiffs cannot identify "a specific prejudice they would likely incur with respect to the merits of their cases based simply on a delay of deadlines."  *Bunnell Bunnell*, 2023 WL 7279354, at *2; *Masciotra v. Vertafore, Inc.*, No. 20-cv-03603, 2021 WL 3887949, at *2 (D. Colo. Feb. 3, 2021) (Wang, M.J.) (rejecting plaintiffs' "vague" prejudice claim because "they have provided no specific examples of how their ability to conduct discovery might be adversely affected by a stay"); *Stone v. Vail Resorts Dev. Co*., No. 09-cv-02081, 2010 WL 148278, at *1 (D. Colo. Jan. 7, 2010) (same).  Notably, a postponement of deadlines or a delayed decision on a substantive motion are insufficient to outweigh the prejudice to a defendant from

6

defending multiple litigations pending the Panel's decision on consolidation. *See Bunnell Bunnell*, 2023 WL 7279354, at *2-3 (finding no prejudice to plaintiff where stay would require postponing close of discovery, expert deadlines, and summary judgment); *Council v. Target Corp.*, No. 13-cv-03479, 2014 WL 859326, at *2 (D. Colo. Mar. 5, 2014) (rejecting argument that ruling on motion or expedited discovery are necessary to prevent prejudice to plaintiffs). This action is in the initial stages of discovery. Defendants' responses to Plaintiffs' first discovery requests, which they propounded less than a month ago, are not yet even due. Likewise, EchoStar's Motion to Dismiss the FAC will not be fully briefed for almost a month, as EchoStar filed the Motion just two weeks ago. For their part, Plaintiffs have no pending motions before the Court. And this action is based on events that took place less than one year ago; Defendants have instituted the appropriate litigation holds and the information Plaintiffs seek in discovery will be no less available to them in the few months necessary for the Panel to rule on the pending MDL Motion and consolidate the cases in an MDL proceeding. *See Stone*, 2010 WL 148278, at *1 (no prejudice where plaintiff argued "with the passage of time, the memories of the parties and other witness may fade, witnesses may relocate or become unavailable, or documents may become lost or inadvertently destroyed").

Additionally, Defendants have moved to transfer and consolidate the related actions in Plaintiffs' own chosen forum, the District of Colorado. Thus, a temporary stay and grant of Defendants' MDL Motion will likely conclude with the consolidated litigation proceeding in this Court.

7

**B.    Denial Of Proposed Stay Will Increase The Possibility Of Inconsistent Rulings And Impose Discovery Burdens On Defendants**

Defendants will face significant hardship if the proposed stay is not granted.  As noted, this case, like the other six federal actions subject to the pending motion to transfer and consolidate, is premised on substantially similar allegations and claims, namely that DISH Wireless has allegedly breached or defaulted on its obligations under various lease and service agreements by failing to make certain payments allegedly owed under those contracts, notwithstanding the fact that DISH Wireless no longer has access to the spectrum licenses that were being carried on the towers.  Denial of the proposed stay will create a significant risk of inconsistent pretrial rulings and likely result in substantial duplication of effort and a waste of resources.[3]

*Masciotra v. Vertafore*, *Inc.* is instructive.  There, this Court granted a defendant's motion to stay pending resolution of a motion to transfer because the typical burdens of discovery would be "compounded by subjecting Defendant[s] to multiple suits in various judicial districts, which increases the possibility of increasingly inconsistent rulings and discovery obligations."  2021 WL 3887949, at *2.  Rejecting plaintiffs' claims to the contrary, this Court noted that its "experience suggests that coordinating discovery efforts between multiple jurisdictions adds complexity even to routine matters."  *Id.  See also*

---

[3] Though Defendants have moved the Panel to transfer the consolidated proceedings to the District of Colorado and before this Court, continuing pretrial proceedings in this action risks inconsistent pretrial rulings and duplicated efforts if the cases are transferred to another court.  *See Musticchi v. Wright Med. Tech., Inc.*, No. 4:19-cv-00607, 2020 WL 13111224, at *1 (E.D. Ark. July 2, 2020) (stay granted by proposed transferee court to postpone "significant time and effort on pretrial matters over the next several months, efforts that would be potentially wasted if the MDL Motion is granted and the cases are transferred to another court").

8

*Fontenot v. NCAA*, No. 1:23-cv-03076, 2024 WL 6990724, at *1 (D. Colo. Feb. 21, 2024) ("Staying [proceedings] will promote the interests of judicial economy, efficiency, and consistency between courts … any potential prejudice to Plaintiffs caused by the stay is outweighed by the risk of inconsistent judgments and the interest of judicial economy.").

Here, Defendants will suffer prejudice if required to respond to Plaintiffs' voluminous discovery requests (which include interrogatories and requests for production to each of the three Defendants) while the MDL Motion is pending. The topics of Plaintiffs' requests are expansive and likely to be duplicated by plaintiffs in the six other actions pending transfer and consolidation. *See, e.g.*, Exhibit B, *Plaintiffs' First Set of Requests for Production to DISH Wireless LLC*, No. 2 ("All Documents and Communications Concerning the actual or contemplated assertion of force majeure, frustration of impossibility, or other similar doctrines with respect to any of DISH's Infrastructure Providers, including Crown Castle."). Compliance with Plaintiffs' discovery requests will be a significant burden that Defendants will likely be required to duplicate in a consolidated litigation if the Panel grants their MDL Motion. *See Stone*, 2010 WL 148278, at *2 (complying with plaintiffs' "significant" discovery requests "would impose on Defendants more than the ordinary burdens of litigation"); *Bunnell Bunnell*, 2023 WL 7279354, at *2 (finding prejudice to defendant where it would "incur the burden and expense of discovery which would be duplicative of discovery once an MDL is created" and risk "inconsistent or contradictory decisions during the course of discovery"); *Lundy*, 2009 WL 1965521, at *1 (granting stay to, *inter alia*, "avoid duplicative discovery efforts").

### C.    A Stay Will Preserve Judicial Resources

A stay will conserve judicial resources and convenience the Court.  A stay will further judicial economy and efficiency because if the Panel grants the MDL Motion, then this proceeding and the six other related actions likely will be consolidated before this Court or another court in the District of Colorado.[4]  Two other district courts have already granted stays of related actions pending consolidation.  *See Seidner*, ECF No. 23, *Order Granting Joint Stipulation for Stay of Proceedings*; *DataVerge*, ECF No. 10, *Order Granting Joint Stipulation Regarding Stay of All Proceedings.*  If this action were not stayed, this Court would be required to preside over similar discovery efforts twice—once while the MDL Motion is pending, and then again once all other parties and cases have been consolidated into the MDL.  It would be much more efficient to conduct discovery on a uniform schedule, once all cases have been consolidated before this Court.  *See Lundy*, 2009 WL 1965521, at *1 (holding that stay pending the Panel's decision will allow the court to avoid "duplicative discovery efforts, unnecessary expenditures of judicial resources and the parties, and [to] maximize judicial economy among the courts."); *see also Masciotra*, 2021 WL 3887949, at *3 (granting stay to avoid the risk of "inconsistent pretrial determinations – such as discovery limitations, scheduling, and the resolution of

---

[4] Notably, a Colorado state court recently ordered consolidation of two related state cases that also arise out of the exact same transactions based on, *inter alia*, their factual similarities.  *See* Exhibit C, *Zayo Group, LLC et al. v. DISH Wireless L.L.C*, 2025CV034300, Feb. 11, 2026 Order Granting Motion to Consolidate (Colo. Dist. Ct., 2d Jud. Dist.) ("In both this action and the related Diamond Action, DISH [Wireless] is relying on the same underlying facts in an attempt to terminate its contractual obligations with Zayo and the Diamond Entities under the doctrines of force majeure, impossibility and frustration of purpose. It is therefore in the interests of litigation efficiency and judicial economy for this action and the related Diamond Action to be consolidated.")

disputes"); *Deutsche Bank Tr. Co. Am. v. Fushimi*, No. 11-cv-02472, 2011 WL 5864987, at *3 (D. Colo. Nov. 22, 2011 ("[A]voiding the risk of inconsistent judgments and the interests of judicial economy will ordinarily outweigh any slight delay caused by a stay pending an MDL panel's ruling."); *F.D.I.C. v. Countrywide Fin. Corp.*, No. 11-cv-02268, 2011 WL 4372915, at *3 (D. Colo. Sept. 19, 2011) ("Judicial resources would best be conserved by imposing a stay until the transfer issue is resolved so that, if the transfer is finalized, the JPML court can determine all pretrial matters in a coordinated manner.").

## D. The Interests Of Non-parties And The Public Support A Stay

A stay will also serve the interests of a relevant non-party to this litigation and the public. As discussed above, *supra* at pp. 3-4, the issues in this proceeding and the six related federal actions pending consolidation are related to the FCC's unprecedented and unforeseeable actions which made it impossible for DISH Wireless to perform its obligations under various lease and service agreements. Several of Plaintiffs' discovery requests relate to Defendants' communications with the FCC, and Defendants may seek third-party discovery from the FCC to prove its affirmative defenses, both in this litigation and the six related actions. The FCC has an interest in participating in third-party discovery in one consolidated litigation, rather than duplicating efforts across, at minimum, seven federal actions. *See Ratcliff v. Brown*, No. 23-cv-00605, 2023 WL 6314566, at *5 (D. Colo. Sept. 28, 2023) (granting stay where non-parties' witnesses may otherwise "have been burdened with discovery unnecessarily").

Further, the public has an interest in "avoiding wasteful efforts by the Court" and the "efficient and just resolution" of this litigation. *F.D.I.C.*, 2011 WL 4372915, at *3 (finding the public interest weighs in favor of staying case); *see also Ratcliff*, 2023 WL

11

6314566, at *5 (granting stay where continued litigation might "unnecessarily tap[]" public funds "in connection with the expenditure of judicial resources" and "participation by non-party witnesses employed by public entities").  A stay of this action pending the Panel's resolution of the MDL Motion serves those interests.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for an order that temporarily stays these proceedings pending the Panel's determination as to whether to consolidate and transfer this action pursuant to 28 U.S.C. § 1407.

Dated:  March 16, 2026.

Respectfully submitted,


/s/ Glenn M. Kurtz
Hugh Q. Gottschalk
Jacob A. Rey
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone: 303.244.1800
Facsimile:  303.244.1879
Email:  gottschalk@wtotrial.com
        rey@wtotrial.com

Glenn M. Kurtz
Joshua D. Weedman
Robert E. Tiedemann
Camille M. Shepherd
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
Telephone: 212.819.8200
Email: gkurtz@whitecase.com
       jweedman@whitecase.com
       rtiedemann@whitecase.com
       camille.shepherd@whitecase.com

Attorneys for Defendant DISH Wireless
L.L.C.; DISH Purchasing Corporation; and
EchoStar Corporation

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on March 16, 2026, I electronically filed the foregoing Defendants' Motion to Stay Proceedings Pending Decision by the Judicial Panel on Multidistrict Litigation with the Clerk of Court using the CM/ECF system which will serve notice on all counsel of record in this case.

*/s/ Glenn M. Kurtz*

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-03756-NYW-CYC

AIRCOMM OF AVON, LLC,
ATLANTIC COAST COMMUNICATIONS LLC,
CCATT LLC,
CCTMO LLC,
CCTM1 LLC,
CCTM2 LLC,
COVERAGE PLUS ANTENNA SYSTEMS LLC,
CROWN ATLANTIC COMPANY LLC,
CROWN CASTLE FIBER LLC,
CROWN CASTLE GT COMPANY LLC,
CROWN CASTLE MU LLC,
CROWN CASTLE SOUTH LLC,
CROWN CASTLE TOWERS 05 LLC,
CROWN CASTLE TOWERS 06-2 LLC,
CROWN CASTLE TOWERS 09 LLC,
CROWN CASTLE USA INC.,
CROWN COMMUNICATION LLC,
GLOBAL SIGNAL ACQUISITIONS LLC,
GLOBAL SIGNAL ACQUISITIONS II LLC,
GLOBAL SIGNAL ACQUISITIONS III LLC,
GLOBAL SIGNAL ACQUISITIONS IV LLC,
GOLDENSTATE TOWERS, LLC,
HIGH POINT MANAGEMENT CO. LLC,
ICB TOWERS, LLC,
INTERSTATE TOWER COMMUNICATIONS LLC,
INTRACOASTAL CITY TOWERS LLC,
PINNACLE TOWERS ACQUISITION LLC,
PINNACLE TOWERS ASSET HOLDING LLC,
PINNACLE TOWERS LLC,
PINNACLE TOWERS III LLC,
RADIO STATION WGLD LLC,
SHAFFER & ASSOCIATES, INC.,
SIERRA TOWERS, INC.,
TOWER DEVELOPMENT CORPORATION, TOWER SYSTEMS LLC,
TOWER TECHNOLOGY COMPANY OF JACKSONVILLE LLC,
TOWER VENTURES III, LLC,
WCP WIRELESS LEASE SUBSIDIARY, LLC, and
TVHT, LLC,

       Plaintiffs,

v.

DISH WIRELESS L.L.C.,
DISH PURCHASING CORPORATION, and
ECHOSTAR CORPORATION,

      Defendants.

---

## PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION TO DEFENDANT DISH WIRELESS L.L.C.

---

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the District of Colorado ("Local Rules"), the above-captioned Plaintiffs (collectively, "Plaintiffs" or "Crown Castle"), by its undersigned attorneys Paul, Weiss, Rifkind, Wharton & Garrison LLP and Haddon Morgan Foreman, hereby request that Defendant DISH Wireless L.L.C. ("Defendant" or "DISH") produce for inspection and copying the documents requested herein (the "Requests" and, individually, the "Request"), within thirty (30) days of service in accordance with the Definitions and Instructions set forth below. Production shall be at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, or at such other time and place as may be agreed upon by counsel.

### DEFINITIONS

1.      "Affirmative Defenses" refers to the First through Ninth Affirmative Defenses in DISH's Answer.

2.      "Answer" refers to Defendant's Answer to Plaintiffs' Complaint filed in the District Court for the District of Colorado by DISH on January 9, 2026.

3.      "Amended Complaint" refers to the amended complaint filed in the District Court for the District of Colorado by Plaintiffs on January 30, 2026.

4. "AT&T" means AT&T Inc. and its past or present subsidiaries, affiliates, predecessors, assigns, agents, representatives, attorneys, directors, officers, employees, or other Persons acting on its behalf.

5. "Boost Mobile" means the wireless carrier brand through which DISH makes wireless communication services available to consumers, as referenced in Paragraph 53 of the Amended Complaint.

6. "Communication(s)" means any transmittal of information (in the form of facts, ideas, inquiries, or otherwise) in any form, written or oral, including notes, correspondence, memos, letters, emails, calendar and meeting invitations, appointment books, audio recordings of telephone calls, voicemails, text messages, instant messages, SMS messages, diaries, messages, posts, or other communications via chat messenger, WhatsApp messages, and messages and posts to X (formerly known as Twitter), Facebook, Instagram, Slack, and any other online forum or platform, or any other similar physical or electronic information.

7. "Concerning," "Relating To," "Regarding," "Reflecting," and any variant thereof, mean in any way, directly or indirectly, in whole or in part, relating to, referring to, discussing, mentioning, pertaining to, containing, analyzing, studying, reporting on, commenting on, constituting, considering, recommending, modifying, amending, recording, evidencing, setting forth, reflecting, showing, disclosing, describing, explaining, summarizing, endorsing, representing, supporting, qualifying, terminating, revoking, refuting, undermining, canceling, contradicting, negating, or concerning.

8. "Document(s)" shall have the broadest construction permissible under Colorado law and means, without limitation, every non-identical copy regardless of origin or location, all writings of any kind, including, without limitation, letters, correspondence, notes, memoranda,

2

directives, reports, analyses, recommendations, surveys, models, projections, slide decks, presentations, employee notes, call notes, meeting agendas, meeting notes, meeting minutes, plans, graphs, charts, photographs, images, email, text messages, instant messages, and other data or data compilations, stored in any medium from which information can be obtained directly by the responding party into a reasonably usable form, including all electronically stored information on hard drives or disks, including laptop computers and/or personal digital devices maintained for personal or business use. A draft or non-identical copy is a separate document within the meaning of this term.

9. "DSA" means the Deployment Services Agreement entered into by Crown Castle and DISH Purchasing Corporation, attached as Exhibit I to the Amended Complaint.

10. "EchoStar" means EchoStar Corporation and its past or present subsidiaries, affiliates, predecessors, assigns, agents, representatives, attorneys, directors, officers, employees, or other Persons acting on its behalf, other than DISH.

11. "Equipment Removal Provision" means Section 11 of the General Terms and Conditions of the MLA.

12. "FCC" means the Federal Communications Commission.

13. "Force Majeure Provisions" means, collectively, Section 20 of the General Terms and Conditions to the MLA and Section 33(e) of the MPA.

14. "Identify" with respect to documents means to provide, to the extent known: (1) the author thereof and the person or persons to whom the document originally was directed; (2) the source from whom Defendant obtained such document or documents; (3) the date of each such document or documents; (4) the current custodian of each such document or documents; (5) the

3

location at which each document or documents is situated; and (6) the subject matter of each such document or documents.

15. "Infrastructure Providers" means any entity providing cellular tower space, equipment, sites for equipment, or other physical network infrastructure to support DISH's provision of wireless services.

16. "Loss of Spectrum Licenses Provision" means Section 7 of the MLA.

17. "MLA" means the Master Lease Agreement entered into by Crown Castle and DISH, attached as Exhibit A to the Amended Complaint.

18. "MPA" means the Master Product Agreement entered into by Crown Castle and DISH, attached as Exhibit B to the Amended Complaint.

19. "Person" means any natural person, corporation, association, partnership, or other business or legal entity.

20. "SpaceX" means Space Exploration Technologies Corp. and its past or present subsidiaries, affiliates, predecessors, assigns, agents, representatives, attorneys, directors, officers, employees, or other Persons acting on its behalf.

21. "Spectrum Licenses" means the licenses to utilize spectrum that EchoStar or DISH purchased at FCC-conducted auctions, as referenced in Paragraph 58 of the Amended Complaint.

22. "Termination Provision" means Section 9 of the General Terms and Conditions of the MLA.

23. "You," "Your," or "DISH" refers to DISH Wireless L.L.C. and its past or present subsidiaries, affiliates, predecessors, assigns, agents, representatives, attorneys, directors, officers, employees, or other Persons acting on its behalf.

4

## INSTRUCTIONS

1. Each Request calls for the production of all responsive Documents in Your possession, custody, or control that have not already been produced in this Action.

2. If You object to any Instruction, Definition, or Request: (i) specifically state whether the objection(s) interposed pertain(s) to all or part of the Instruction, Definition, or Request being challenged; (ii) state with reasonable particularity the grounds for the objection; (iii) specifically state whether any Documents or categories of Documents are being withheld and, if so, which of the stated objection or objections forms the basis for Your decision to withhold otherwise responsive Documents or categories of Documents; (iv) specifically state the manner in which You intend to limit the scope of Your production, if at all; and (v) produce all Documents to which the objection or objections do not apply.

3. If, in responding to the Requests, you encounter any ambiguities when construing a Request, Definition, or Instruction, Your response shall set forth the matter deemed ambiguous and the construction used in responding.

4. If You claim any privilege or any other protection from or limitation on discovery, state with specificity the privilege or other reason for withholding the Document in a numerical log that identifies for each such Document: (i) the form of the Document (*e.g.*, memorandum, letter, note, email, etc.); (ii) the date of the Document; (iii) the name of each person who authored, created, wrote, and/or sent the Document; (iv) the name of each person to whom the Document was addressed or otherwise appears from the Document to have received a copy; (v) the subject matter of the Document; and (vi) the basis for asserting privilege or limitation of discovery, including, if relevant, the attorney and client involved.

5

5.    If no Documents or things exist that are responsive to a particular Request, so state in writing.

6.    Documents produced in response to these Requests shall be produced as they are kept in the usual course of business or shall be organized and labeled to indicate the specific paragraph(s) of the Requests to which they respond.  The original or a copy of each Document is requested to be produced.  Any copy of a Document that varies in any way from the original or from any other copy of the Document, whether by reason of handwritten or other notation or any omission, shall constitute a separate Document and must be produced, whether or not the original of such Document is within Your possession, custody, or control.  All Documents shall be produced in accordance with the "Requested Production Format" attached as Exhibit A.  Please include with each document production a cover letter providing a description of the Documents and Communications being produced.

7.    Each Request shall be construed according to its own terms, subject to these Definitions and Instructions.  Although some of the Requests may overlap with others, no Request should be read as limiting any other.

8.    If any portion of a Document is responsive to any Request, produce the entire Document and all family members of that Document, including, but not limited to, any transmittal sheet, cover letter, exhibit, enclosure, or attachment.

9.    For purposes of interpreting or construing the scope of these Requests, all terms shall be given their most expansive and inclusive interpretation.  This includes, without limitation, the following:

a.   Construing "and" as well as "or" in the disjunctive or conjunctive, as necessary to make the Request more inclusive and bring within the scope of the Request any

6

information that might otherwise be construed to be outside the scope of the Request;

b.  Construing the singular form of the word to include the plural, and the plural form to include the singular;

c.  Construing the masculine to include the feminine, and vice versa;

d.  Construing the term "including" to mean "including but not limited to";

e.  Construing the term "all" to mean "any and all," and vice versa;

f.  Construing the term "each" to include "every," and construing "every" to include "each";

g.  Construing the use of a verb in any tense as the use of the verb in all other tenses; and

h.  Construing and interpreting all spelling, syntax, grammar, abbreviations, idioms, and proper nouns to give proper meaning and consistency to their context.

10.  If any Document or Communication cannot be produced in full, it should be produced to the extent possible, and You should specify the reasons for Your inability to produce the remainder and state whatever information, knowledge, or belief You have concerning the unproduced portion.  Any purportedly privileged Document or Communication containing non-privileged matter shall be produced with the purportedly privileged portion excised.  You shall identify the specific location on each page where any purportedly privileged matter has been excised.

11.  If you withhold any Document or portion of a Document based on a claim of privilege, work product, or as subject to a recognized immunity from discovery, you must:

7

a. Produce a separate log that complies with the requirements of Federal Rules of Civil Procedure 26(b)(5) including a description of the Documents sufficient to allow the receiving party to assess the privilege or protection claim without disclosing any privileged information, and including at least the following:

    i. the author(s);

    ii. the Person(s), entity, or entities to whom it was addressed, or to whom the document or a copy of the document was sent;

    iii. the nature or basis of the privilege or protection claimed;

    iv. the date of the document; and

    v. identification of all attorneys and a description of their role.

b. If a Document contains both privileged and non-privileged information, it shall be produced with the privileged information redacted in such a way as to show the location of the redaction within the Document. The portion of each such redaction shall be described in the log described in subpart (a) of this Instruction.

12. These Requests are continuing in nature and if at any time You or Your counsel becomes aware of additional Documents responsive to these Requests, such Documents shall be promptly produced.

13. Plaintiffs reserve their right to seek supplemental responses to these Requests, and/or to seek additional Documents through further requests.

14. Unless otherwise stated in a specific Request, the Requests herein seek Documents and Communications that were dated, prepared, generated, or received during the time period beginning January 1, 2020 and continuing through the present (the "Relevant Time Period").

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1

All Documents and Communications Concerning the facts and circumstances underlying DISH's claim of force majeure under the MLA and MPA, including as asserted in DISH's September 24, 2025, September 25, 2025, October 9, 2025, and November 10, 2025 correspondence to Crown Castle.

### REQUEST FOR PRODUCTION NO. 2

All Documents and Communications Concerning the actual or contemplated assertion of force majeure, frustration of purpose, impossibility, or other similar doctrines with respect to any of DISH's Infrastructure Providers, including Crown Castle.

### REQUEST FOR PRODUCTION NO. 3

All Documents and Communications Concerning any actual or contemplated sale of Spectrum Licenses by DISH or EchoStar, including but not limited to Communications with AT&T and SpaceX Concerning such sales.

### REQUEST FOR PRODUCTION NO. 4

All Documents and Communications Concerning any actual, threatened, or contemplated adverse action by the FCC with respect to the Spectrum Licenses, including but not limited to any supposed "direct[ion]" by the FCC that DISH or EchoStar "either sell or forfeit its spectrum licenses nationwide," *see* ECF No. 50 at 5.

### REQUEST FOR PRODUCTION NO. 5

All Documents and Communications Concerning any meetings between representatives of DISH or EchoStar, on the one hand, and representatives of the FCC or the United States government, on the other, relating in any way to the Spectrum Licenses, including but not limited to each and every of the "numerous meetings" held "at the highest levels with the FCC and the government to avoid the involuntary loss of the spectrum licenses," *see* ECF 50 at 5.

### REQUEST FOR PRODUCTION NO. 6

All Documents and Communications Concerning DISH's or EchoStar's usage or utilization of the Spectrum Licenses, including Concerning any requirements, commitments, benchmarks, milestones, progress reports, schedules, guidance, or analyses regarding the same, and any Communications with the FCC Concerning the foregoing.

### REQUEST FOR PRODUCTION NO. 7

All Documents and Communications Concerning any consideration by DISH or EchoStar of the risk or possibility of revocation or non-renewal of the Spectrum Licenses by the FCC.

9

**REQUEST FOR PRODUCTION NO. 8**

All Documents and Communications Concerning the Force Majeure Provisions, the Loss of Spectrum Licenses Provision, the Termination Provision, and the Equipment Removal Provision, including but not limited to the drafting, negotiation, meaning, or intent of these provisions.

**REQUEST FOR PRODUCTION NO. 9**

All Documents and Communications Concerning DISH's failure to make payments under the MLA, MPA, and DSA, including but not limited to as alleged in Paragraphs 113–124 of the Amended Complaint.

**REQUEST FOR PRODUCTION NO. 10**

Documents and Communications sufficient to show the ownership and any transfer of ownership of each of the Spectrum Licenses.

**REQUEST FOR PRODUCTION NO. 11**

All Documents and Communications Concerning the ability, willingness, or capability of DISH or EchoStar to resist, oppose, challenge, or litigate any adverse action by the FCC Concerning the Spectrum Licenses, including but not limited to Documents reflecting the factual support for Charlie Ergen's September 15, 2025 statement that EchoStar "would win the battle" if it litigated against the FCC.

**REQUEST FOR PRODUCTION NO. 12**

Documents sufficient to show DISH's actual and projected financial condition, including but not limited to:

(a) Historical and projected financial results, including any business plans, strategic plans, budgets, financial guidance, financial models, financial forecasts, depreciation schedules, capital expenditure plans, or other projections;
(b) Monthly, quarterly, and annual financial statements;
(c) Current assets and liabilities; and
(d) Interim financial reports.

**REQUEST FOR PRODUCTION NO. 13**

All Documents and Communications Concerning Boost Mobile's transition to a hybrid mobile network operator ("MNO") business model, including but not limited to Boost Mobile's current and projected financial condition, revenue, profitability, and subscriber base while operating an MNO business model.

10

## REQUEST FOR PRODUCTION NO. 14

All Documents and Communications related to DISH's "need[] to continue to operate certain Sites" under the MLA and "operate certain Services" under the MPA "for a period of time," as stated in DISH's September 24, 2025 and September 25, 2025 correspondence to Crown Castle.

## REQUEST FOR PRODUCTION NO. 15

During the time period of January 1, 2025 to the present, all Documents and Communications Concerning any consideration, discussion, or evaluation of bankruptcy proceedings involving DISH.

## REQUEST FOR PRODUCTION NO. 16

All Documents and Communications produced by DISH in any legal action involving an Infrastructure Provider Concerning DISH's assertion of force majeure, frustration of purpose, impossibility, or other similar doctrine with respect to the FCC's alleged actions concerning the Spectrum Licenses, including but not limited to the following actions: (i) *American Towers LLC* v. *DISH Wireless L.L.C.*, 1:25-cv-03311-SKC-SBP (D. Colo. Oct. 20, 2025); (ii) *Branch Towers III LLC* v. *DISH Wireless L.L.C.*, No. 26CV30478 (Colo. Dist. Feb. 6, 2026); (iii) *DataVerge LLC* v. *DISH Wireless L.L.C.*, No. 503203/2026 (N.Y. Sup. Ct. Kings Cnty. Jan. 28, 2026); (iv) *Diamond Towers II LLC* v. *DISH Wireless L.L.C.*, No. 2026CV30222 (Colo. Dist. Ct. Jan. 19, 2026); (v) *Harmoni Towers Infrastructure LLC* v. *DISH Wireless L.L.C.*, No. 2026CV030349 (Colo. Dist. Jan. 29, 2026); (vi) *Royal Group Plaza, LLC* v. *DISH Wireless L.L.C.*, No. 2:26-cv-01092-MAR (C.D. Cal. Feb. 3, 2026); (vii) *Sabre Industries, Inc.* v. *DISH Wireless Leasing L.L.C.*, No. 1:26-cv-00209-JAV (S.D.N.Y. Jan. 9, 2026); (viii) *Zayo Group, LLC* v. *DISH Wireless L.L.C.*, No. 2025CV034300 (Colo. Dist. Ct. Nov. 26, 2025); and (ix) *SBA Telecommunications, LLC* v. *DISH Wireless L.L.C.*, No. 1:26-cv-00218 (W.D.N.Y. Feb. 5, 2026).

## REQUEST FOR PRODUCTION NO. 17

All Documents and Communications DISH intends to use or rely upon in connection with establishing any defense or Affirmative Defense in this action.

Dated: February 17, 2026                  Respectfully submitted,

By: /s/ *Jay Cohen*
Laura A. Menninger
HADDON MORGAN FOREMAN
945 N. Pennsylvania Street
Denver, CO 80203
Tel: (303) 831-7364
E-mail: lmenninger@hmflaw.com

Jay Cohen
Jeffrey J. Recher

11

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990
E-mail:   jaycohen@paulweiss.com
             jrecher@paulweiss.com

*Counsel for Plaintiffs*

12

## Exhibit A

### Document Production Format

I.     Overview

     A.     All documents shall be produced as Bates-stamped tagged image file format ("TIFF") images along with an image load/cross reference file, a data load file with fielded metadata, and document-level extracted text for electronically stored information ("ESI") or optical character recognition ("OCR") text for scanned hard copy documents and non-searchable ESI. Details regarding requirements, including files to be delivered in native format, are below.

II.     TIFF Image Requirements

     A.     All documents shall be produced as TIFF images in 300x300 dpi Group IV single-page monochrome format.

     B.     All such images shall be sequentially Bates-stamped using a consistent length with leading zeros in the number. The format of the Bates numbers shall not change across productions.

     C.     Images shall include the following content where present:

         1.     For word processing files (*e.g.,* Microsoft Word) – Comments and "track changes" (and similar in-line editing).

         2.     For spreadsheet files (*e.g.,* Microsoft Excel) – Hidden columns, rows, and sheets; comments; and "track changes" (and similar in-line editing).

         3.     For presentation files (*e.g.,* Microsoft PowerPoint) – Speaker notes and comments.

     D.     Reasonable care shall be taken not to degrade the legibility of documents during the imaging process. If legibility is found to have been degraded, the receiving party may make reasonable requests for re-production of these documents.

III.     Native Format Requirements

     A.     Spreadsheet files

         1.     Spreadsheet files (*e.g.,* Microsoft Excel) shall be provided in native format.

         2.     In lieu of a TIFF image version of each spreadsheet file, a Bates-stamped single-page TIFF placeholder file shall be produced along with the native format version of each file.

13

3.     When redaction is necessary, a redacted TIFF image version shall be produced. The parties reserve the right to request access to the native format versions of such files.

B.     Multimedia files

    1.     Multimedia files (*e.g.,* audio or video files) shall be provided in native format.

    2.     In lieu of a TIFF image version of each multimedia file, a Bates-stamped single-page TIFF placeholder file shall be produced along with the native format version of each file.

    3.     The parties reserve the right to edit multimedia files using industry standard methods if redaction of such files is deemed necessary.

C.     Other files

    1.     In limited circumstances, it may be necessary to obtain or view the native format versions of files, including color documents/images and dynamic files, such as databases. The parties reserve the right to reasonably request access to the native format versions of such files and/or an image format that supports viewing color documents.

IV.    Image Load/Cross Reference File Requirements

A.     A single-page image load/cross-reference file shall be provided with each production.

B.     The file should use the Concordance Image Viewer (.OPT) format, as in the sample below. Note, the volume label information ("MSC001" in the sample .opt file) is optional:

*Sample Concordance Image Viewer .opt file:*
MSC000001,MSC001,MSC\0000\00000001.TIF,Y,,,3
MSC000002,MSC001,MSC\0000\00000002.TIF,,,,
MSC000003,MSC001,MSC\0000\00000003.TIF,,,,
MSC000004,MSC001,MSC\0000\00000004.TIF,Y,,,2
MSC000005,MSC001,MSC\0000\00000005.TIF,,,,

V.    Extracted Text/OCR Requirements

A.     Extracted text and/or OCR text shall be provided for all documents as separate, document-level text files; extracted text and/or OCR text shall not be embedded in the .DAT file (as defined below).

B.     Document-level text file names shall consist of the beginning Bates number information of the document.

14

C.      If a document is provided in native format with a single-page placeholder TIFF image (*e.g.,* spreadsheet files), the text file shall contain the full extracted text of the native file.

D.      OCR text shall be provided for all redacted documents in lieu of extracted text.

E.      With respect to produced text files, the specifications herein address ANSI text-based productions.   Unicode text-based productions shall be provided for productions containing non-English language documents.

VI.     Data Load File Requirements

A.      A data load file shall be provided with each production.

B.      The file shall be a Concordance-loadable data file ("\.DAT" file) and contain Bates-stamp and metadata information as detailed below.

C.      The delimiters and qualifiers to be used in the .DAT file are:

*Record delimiter:*    Windows newline/Hard return (ASCII 10 followed by ASCII 13)
*Field delimiter:*   (ASCII 20)
*Multi-value delimiter:*   Semicolon ; (ASCII 59)
*Text qualifier:*   Small thorn þ (ASCII 254)

D.      With respect to .DAT files, the specifications herein address ANSI text-based productions. Unicode text-based productions shall be provided for productions containing non-English language documents.

E.      The .DAT file shall have a header line with the below listed field names and shall include the corresponding information per each applicable field:

| Field | Comments | Document Types |
|-------|----------|----------------|
| BegBates | Beginning Bates number. | All. |
| EndBates | Ending Bates number. | All. |
| BegRange | Bates number of first page of family range (*e.g.,* first page of an email). | All. |
| EndRange | Bates number of last page of family range (*e.g.,* last page of last attachment to an email). | All. |
| PageCount | Number of TIFF image pages in the produced document. | All. |
| FileExtension | File extension of the original document (*e.g.,* .msg, .docx, .jpg). | All. |
| FileSize | File size of the original document.  Format: bytes. | All. |

15

| Field | Comments | Document Types |
|---|---|---|
| Title | Title of the original document. | Loose files and attachments. |
| Custodian | Custodian full name.  Format: LASTNAME, FIRSTNAME. | All. |
| AllCustodian | Full name of all custodians for whom the document is being produced.  Format: LASTNAME, FIRSTNAME; LASTNAME, FIRSTNAME. | All. |
| Author | Author of document from available metadata. | Loose files and attachments. |
| LastSavedBy | Last Saved By field value extracted from metadata of a native file. | Loose files and attachments. |
| Company | Company field extracted from the metadata of a native file. | Loose files and attachments. |
| From | Email author. | Email only. |
| To | Email addressee(s). | Email only. |
| CC | Email addressee(s), carbon copy. | Email only. |
| BCC | Email addressee(s), blind carbon copy. | Email only. |
| Subject | Email subject. | Email only. |
| DateCreated | File creation date.  Format: MM/DD/YYYY. | All. |
| TimeCreated | File creation time.  Format: HH:MM:SS AM/PM | All. |
| DateModified | File modification date.  Format: MM/DD/YYYY. | All. |
| TimeModified | File modification time.  Format: HH:MM:SS AM/PM | All. |
| DateSent | Email sent date.  Format: MM/DD/YYYY. | Email only. |
| TimeSent | Email sent time.  HH:MM:SS AM/PM. | Email only. |
| DateReceived | Email received date.  MM/DD/YYYY. | Email only. |
| TimeReceived | Email received time.  HH:MM:SS AM/PM. | Email only. |
| DateAccessed | Date document was last accessed. | All. |
| TimeAccessed | Time document was last accessed. | All. |
| MeetingStartDate | Start date of calendar appointment.  Format: MM/DD/YYYY | Calendar items only. |
| MeetingStartTime | Start time of calendar appointment.  Format: HH:MM:SS AM/PM | Calendar items only. |
| MeetingEndDate | End date of calendar appointment.  Format: MM/DD/YYYY | Calendar items only. |
| MeetingEndTime | End date of calendar appointment.  Format: HH:MM:SS AM/PM | Calendar items only. |
| TimeZone | The time zone in which files were standardized during processing (*e.g.*, GMT). | All. |

16

| Field | Comments | Document Types |
|---|---|---|
| MessageID | Globally unique identifier for a message which typically includes messageid and a domain name (*e.g.*, <0E6648D558F338179524D555@m1p.contoso.net). | Email only. |
| ConversationIndex | Email thread identification. | Email only. |
| Importance | Email flag indicating priority level set for message. | Email only. |
| Sensitivity | Sensitivity field from email messages. | Email only. |
| FileName | Name of file as maintained in the ordinary course of business. | Loose files and attachments. |
| FilePath | Original path to the file or email message. | All. |
| AllFilePaths | For globally and within custodian de-duplicated productions.  Folder paths to this document's duplicates and the original path.  Each path will contain the associated custodian. | All. |
| HiddenContent | Denotes if file contains hidden content. Format: Yes/No value. | Loose files and attachments. |
| MD5Hash | Unique file identifier. | All. |
| TextPath | The production deliverable path to the extracted text or OCR for the document, including the file name. | All. |
| NativePath | The production deliverable path to the native-format file for the document, including the file name (if a native-format file is provided). | Loose files and attachments. |

F.   The parties shall de-duplicate stand-alone documents or entire document families globally using MD5 or SHA-1 Hash value matching.  Email attachments shall not be eliminated from the parent email.  Hard copy documents shall not be eliminated as duplicates of responsive ESI.

G.   In globally de-duped, incremental productions, there will be instances when production of documents from additional custodians will include documents previously produced.  A Custodian Append overlay load file using the load file format described above shall be provided with updated AllCustodian and AllFilePaths fields; BegBates and EndBates fields may be used as the unique identifiers.

VII.   Miscellaneous

A.   All document family relationships shall be produced together and children files should follow parent files in sequential Bates number order.

17

B.    Embedded documents shall be extracted from the parent document with family relationship intact.

C.    Productions shall be provided using industry standard encryption software or hardware.  Any electronic transmission of produced materials must be done via a secure file transfer system.

D.    If particular documents warrant a different format (*e.g.*, production of color images instead of black and white), the parties shall cooperate to arrange for the mutually acceptable production of such documents.

E.    The parties agree not to knowingly degrade the searchability of documents as part of the document production process.  For example, extracted text should not be replaced by OCR text except where appropriate (*e.g.*, OCR for redacted documents).

F.    Redacted documents may have certain metadata fields withheld from production. The parties shall cooperate to create a list of metadata fields which may be produced for these documents.

G.    All documents shall be processed so as to normalize the time zone.

18